**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS LESTER STARK,
            *Petitioner-Appellant,*

v.

ROD HICKMAN, WARDEN,
            *Respondent-Appellee.*

No. 03-17241

D.C. No.
CV-02-00290-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
October 21, 2005—San Francisco, California

Filed August 1, 2006

Before: Sidney R. Thomas and William A. Fletcher,
Circuit Judges, and James C. Mahan,* District Judge.

Opinion by Judge Mahan

---

*The Honorable James C. Mahan, United States District Judge for the
District of Nevada, sitting by designation.

**COUNSEL**

John J. Jordan, San Francisco, California, for the petitioner-appellant.

John Deist, Office of the California Attorney General, San Francisco, California, for the respondent-appellee.

**OPINION**

MAHAN, District Judge:

Thomas Stark, a California state prisoner, appeals the district court's dismissal of his pro se 28 U.S.C. § 2254 habeas corpus petition. Stark contends that his federal right to due process was violated at his California state trial for murder when the trial court charged the jury during the guilt phase that he was to be presumed "conclusively sane" by the jury.

## I.   STANDARD OF REVIEW

The district court's decision to dismiss a petition for a writ of habeas corpus under 28 U.S.C. § 2254 is reviewed *de novo*. *Patterson v. Gomez*, 223 F.3d 959, 962 (9th Cir. 2000). The petition at issue here was filed after 1996; as such, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). Under

AEDPA, a federal court can reverse a state court decision denying relief only if that decision was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to clearly established Supreme Court precedent if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or reaches a different conclusion based on facts materially indistinguishable from a Supreme Court case. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). A state court's decision constitutes an unreasonable application of Supreme Court precedent if the state court identifies the correct governing legal principles, but the application of law to the facts is objectively unreasonable. *Id.* An unreasonable application is different from an incorrect or erroneous application of federal law. *Id.* at 793. Accordingly, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. *Id.*

Furthermore, even if the state court's ruling is clearly contrary to or an unreasonable application of Supreme Court precedent, such an error would justify relief only if the error had a "substantial and injurious effect or influence in determining the jury verdict." *Penry*, 532 U.S. at 795 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Shackleford v. Hubbard*, 234 F.3d 1072, 1079 (9th Cir. 2000).

## II.   BACKGROUND

Petitioner Thomas Stark and his wife Marilyn Stark were married in 1972 and had two children. In 1995, Marilyn began having an affair with Steven Johnson. She informed petitioner of the affair during the summer of 1996 and shortly thereafter moved into an apartment with Johnson.

After he learned of the affair, petitioner's behavior began to change. He lost weight, could not sleep, became depressed, wept frequently and often spoke of committing suicide. He also threatened to kill Johnson and then himself if Marilyn did not end the affair.

About two weeks after Marilyn moved in with Johnson, petitioner visited the apartment and confronted Johnson. Petitioner punched Johnson in the chest and told him that if he caught Johnson there again, he would kill him. Several weeks later, petitioner returned to the apartment and again confronted Johnson, threatening to kill him.

On February 24, 1997, petitioner and Marilyn went out to dinner to discuss their relationship and the possibility of a reconciliation. However, at the restaurant, Marilyn informed petitioner that she would not be moving back home. They left the restaurant. On their way back to petitioner's home, petitioner noticed Johnson following them in his truck. When petitioner and Marilyn arrived home, Johnson pulled up to the house. He was driving fast and "burned rubber" before stopping to park. Marilyn had told Johnson that she was going to ask petitioner for a divorce and the two had agreed to meet later that evening.

When Johnson approached petitioner's house, Marilyn went outside and spoke with him in the front yard. Petitioner, who had been in the kitchen, came out onto the porch with a gun. He waived the gun in the air and told Johnson, "Leave, little worm." Johnson told petitioner to put down the gun and fight like a man. Johnson then got into his truck and left. Petitioner and Marilyn returned to the kitchen and petitioner talked about committing suicide.

About 45 minutes to an hour later, Johnson returned to petitioner's house. Marilyn went outside and told Johnson to leave and that she would meet him after consoling petitioner. Petitioner, who was at the kitchen window, told Johnson to

leave, and Johnson in turn yelled at petitioner to come out. Eventually, Marilyn persuaded Johnson to leave. Marilyn left the house sometime thereafter and drove to a bowling alley to look for Johnson. She returned about 15 minutes later and pulled into the driveway of a neighbor. Petitioner came out of his house and told Marilyn to park the car and come into the house. He informed Marilyn that he had spoken with Johnson, that Johnson was coming over, and that he was going to "settle this" matter and fix Johnson once and for all.

Johnson arrived at petitioner's house a short time later. Petitioner went outside with a revolver and met Johnson on the sidewalk, calling him a little worm. Johnson told petitioner to put the gun down and fight like a man. Petitioner and Johnson began pushing each other. During the scuffle, petitioner stumbled and fired his gun into the ground. Petitioner regained his balance and pushed Johnson against a wall between the garage and house. He pointed the gun at Johnson's torso area and made a mocking gunshot sound — "boom, boom." The two then resumed their pushing match and the gun went off, shooting Johnson in the stomach. The neighbor ran into petitioner's house to call the police and saw that Marilyn was already on the telephone with 911. The neighbor went back outside and saw that petitioner was leaning over Johnson. When he turned to go back to the house, he heard at least two more gunshots.

Marilyn was on the phone with the 911 dispatcher when she heard the shots. Within a minute, she heard three more shots. When she came out, Johnson was lying on the ground on his side and petitioner was leaning over him. Petitioner nudged or kicked Johnson's head, saying that Johnson was dead. Petitioner went back inside the house, unloaded the gun and put it on the counter. He then swallowed a large quantity of pills and walked out the back door.

When police and firefighters arrived on the scene, they found Marilyn cradling Johnson, who was lying on the walk-

way. Police officers did not find a knife or weapon in John-son's possession or near him on the ground. Johnson was then taken by ambulance to the hospital, where a hospital orderly found a knife in the sheets of the hospital gurney on which Johnson had been placed.

Officers eventually entered petitioner's house and found the gun, five expended shells, checks from petitioner to his children, and letters from petitioner to his family and friends. They later found petitioner unconscious in a pickup truck in front of his parents' house and arrested him.

Johnson did not survive the shooting. A forensic patholo-gist found that the cause of death was multiple gunshot wounds. The pathologist opined that Johnson most likely suf-fered a gunshot wound to his abdomen first, followed by a shot in the neck and two shots in the back.

Petitioner was charged with first degree murder and per-sonal use of a firearm in California state court. He pled not guilty and, alternatively, not guilty by reason of insanity. In accordance with California's standard practice, petitioner's state jury trial was bifurcated into a guilt phase and a sanity phase. At the conclusion of the first phase of trial, the trial court charged the jury that petitioner was to be presumed "conclusively sane." The jury found petitioner guilty of first degree murder and found the firearm allegation to be true. At the second phase of the trial, the jury found petitioner was legally sane at the time of the offense charged. Petitioner thereafter moved for a new trial or, alternatively, for modifi-cation of the verdict. The trial court granted petitioner's alter-native motion to modify verdict, finding the evidence insufficient to support the verdict of murder in the first degree. Accordingly, the court reduced the verdict to second degree murder.

After unsuccessful direct appeals in state court, petitioner filed a federal petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging California's jury instruction on the presumption of sanity and the trial court's refusal to give an instruction on antecedent threats. The district court denied the petition and then issued a certificate of appealability only as to the former issue. Because this court has not granted a certificate of appealability as to the latter, it declines to expand the scope of the appeal by considering any claim relating to antecedent threats. *See* 28 U.S.C. § 2253; *Slack v. McDaniel*, 529 U.S. 473 (2000).

## III. DISCUSSION

### A. Presumption of Sanity Instruction

We first address whether the trial court's instruction during the guilt phase of the trial that the jury was to conclusively presume petitioner was sane violated his right to due process.

In California, there are two purposes for which a criminal defendant may introduce evidence that he suffers from a mental disease, defect or disorder. First, the defendant may plead not guilty to the offense charged and second, not guilty by reason of insanity. *See Patterson v. Gomez*, 223 F.3d 959, 965 (9th Cir. 2000). When such a plea is entered, the court conducts a bifurcated trial. *Id.* at 964. In the first phase of trial, the defendant's guilt is determined without reference to his plea of insanity. *Id.* If the defendant is found guilty, the trial proceeds to a second phase in which his legal sanity is determined. *Id.*

Petitioner in this case contended during the guilt phase that he did not possess the mental state required for first degree murder. In support of his contention, the defense called two psychiatrists, who testified that petitioner suffered from a "major depressive disorder and "an acute stress disorder" prior to and at the time of the shooting. According to the defense, such testimony established that, on the night in question, petitioner did not form the requisite mens rea for murder.

At the conclusion of the guilt phase of petitioner's trial, the trial court instructed the jury to conclusively presume petitioner was sane:

> *In the guilt phase of a criminal action the defendant is conclusively presumed to be sane*; however, you have received evidence regarding a mental defect or mental disorder of the defendant at the time of the commission of the crime charged, namely, murder of the first degree, murder of the second degree, or the lesser crime thereto, namely, voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought which are an element of the crime charged, namely murder of the first degree, murder of the second degree, or the lesser crime of voluntary manslaughter.

Petitioner argues that this instruction, given without a definition of insanity, led the jurors to believe they could not consider whether petitioner's alleged mental disability precluded him from forming the requisite intent to commit murder. Petitioner contends that as a result, the instruction had the effect of lowering the state's burden of proving the requisite intent, thereby violating his right to due process.

The California Court of Appeal rejected petitioner's argument, holding there was no possibility that petitioner was prejudiced by the trial court's instruction. In so ruling, the Court of Appeal relied on the California Supreme Court's decision in *People v. Coddington*, 23 Cal. 4th 529 (2000), *overruled on other grounds*, *Price v. Superior Court*, 25 Cal. 4th 1046 (2001). In *Coddington*, the California Supreme Court addressed a defendant's claim that the presumption of sanity instruction given during the guilt phase of his trial prejudicially undermined his defense of lack of premeditation

because the jury could have concluded that evidence of his mental illness could not be considered. *Id.* at 584-85. The court held that the instruction correctly stated the law and noted that the defendant neither objected to the instruction nor sought modification. *Id.* at 584 ("A defendant who believes that an instruction requires clarification must request it."). The court nevertheless held that the defendant suffered no prejudice because: (1) the instruction expressly advised the jury that evidence of a mental disease or defect could be considered in determining if the requisite mental states were present; and (2) the prosecutor and defense counsel argued the presence or absence of mental disease during closing arguments, with defense counsel reminding the jury that whether the defendant was mentally ill was for the jury to determine. *Id.* at 584-85. The Court of Appeal found *Coddington* dispositive of the instant case, noting that as in *Coddington*, petitioner did not object to or seek modification of the instruction below. Furthermore, "the jury was instructed that it could consider the evidence of [petitioner's] mental defect or mental disorder in determining whether he formed the requisite specific intent and the issue of [petitioner's] mental state was vigorously debated during the closing arguments of both the prosecutor and defense counsel." *Id.*

Petitioner contends that the Court of Appeal's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. Petitioner's primary authority is this court's decision in *Patterson v. Gomez*, 223 F.3d 959 (9th Cir. 2000), which declared a similar instruction on the presumption of sanity to be unconstitutional.

Before we proceed to a discussion of *Patterson*, we find that contrary to the California Court of Appeal's conclusion, *Coddington* is not dispositive of the instant issue. While the California Supreme Court stated in *Coddington* that the presumption of sanity instruction "correctly states the law," *id.* at 584, it did not address the exact holding in *Patterson*, *i.e.*,

whether instructing the jury of this conclusive presumption violates due process. Specifically, the issue presented in *Coddington* was whether the presumption of sanity instruction given *Coddington* during the guilt phase of the defendant's trial was error which prejudicially undermined his guilt phase defense of lack of premeditation of the murders charged. *Id.* Thus, the *Coddington* court neither addressed the constitutionality of the instruction itself nor rendered a decision with regard to it. Rather, the court merely found, on the facts of that case, that the defendant was not prejudiced by the challenged instruction. Therefore, *Coddington* is not on point because the issue presented in this case was not actually decided there. In any event, the Court of Appeal's decision does not readily explain how the facts of this case were materially distinguishable from those in *Patterson*.

In *Patterson*, the defendant was charged with murdering his daughter. *Id.* at 961. The killing occurred while the two were sitting beside a California highway. *Id.* Patterson picked up the girl and lunged in front of a large semi truck, killing her and injuring himself. *Id.* Patterson had a history of depression and had been hospitalized once after an attempted suicide. *Id.* At the time of the killing, he was experiencing serious marital and financial difficulties, had not slept for days, and had stopped taking his prescribed psychotropic medications. *Id.* Patterson was charged with first degree murder and pled not guilty and not guilty by reason of insanity. *Id.* At the conclusion of the guilt phase of trial, the jury was instructed to presume that Patterson was sane at the time of the charged offense,[1]

---

[1]The following instruction was given during the guilt phase of Patterson's trial:

> Evidence has been received regarding a mental disease or mental disorder of the defendant at the time of the crime in the information. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in the information, and are [sic] found in the definitions of murder.

and he was convicted of first degree murder. *Id.* at 961-62. The same jury then hung on the question of whether Patterson was sane. *Id.* at 962. A second jury, empaneled to try only the sanity question, found Patterson sane. *Id.*

The Ninth Circuit subsequently set aside Patterson's conviction, declaring that the California jury instruction on the presumption of sanity violated due process. *Id.* at 966. In so ruling, the court relied upon the federal law established by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510 (1979), and *Francis v. Franklin*, 471 U.S. 307 (1985). Both of these cases involved jury instructions that were found unconstitutional because they shifted the burden of proof to the defendant.

**[1]** In *Sandstrom*, the Court considered a jury instruction stating "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 512. The Court held that when given in a case in which the defendant's intent is an element, the instruction is unconstitutional because it has "the effect of relieving the State of the burden of proof . . . on the critical question of [the defendant's] state of mind." *Id.* at 521. In *Francis*, the Court, relying on *Sandstrom*, considered instructions stating "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted[,]" and "a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts[.]" *Francis*, 471 U.S. at 309. The Court held that

---

> If from all the evidence you determine to be credible you have a reasonable doubt whether the defendant formed any required mental state or had the necessary specific intent, you must find that he did not have such mental state or specific intent.
>
> *At the time of the alleged offense charged in the information, you were [sic] instructed to presume that the defendant was sane.*

*Patterson*, 223 F.3d at 964 (emphasis in original).

because intent was an element of the charged offense, such instructions were unconstitutional "because a reasonable jury could have understood the challenged portions of the jury instruction . . . as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent." *Id.* at 325.

**[2]** Relying on *Sandstrom* and *Francis*, we declared in *Patterson* that California's instruction on the presumption of sanity was unconstitutional under clearly established federal law. *Patterson*, 223 F.3d at 962-67. As we explained:

> The problem with the instruction given in this case is that it tells the jury to presume a mental condition that — depending on its definition — is crucial to the state's proof beyond a reasonable doubt of an essential element of the crime. Under California law, a criminal defendant is allowed to introduce evidence of the existence of a mental disease, defect, or disorder as a way of showing that he did not have the specific intent for the crime. . . . If the jury is required to presume the non-existence of the very mental disease, defect, or disorder that prevented the defendant from forming the required mental state for [the crime], that presumption impermissibly shifts the burden of proof for a crucial element of the case from the state to the defendant. Whether the jury was required to presume the non-existence of a mental disease, defect, or disorder depends on the definition of sanity that a reasonable juror could have had in mind.

*Id.* at 965.

In so ruling, we contrasted the legal definition of "sanity" under California law with the commonly understood definition of the term. 233 F.3d at 966. Under California law, "[s]anity is defined using a modernized version of the

*M'Naghten* Rule: a person is insane if he or she is 'incapable of knowing or understanding the nature and quality of his or her act [or] of distinguishing right from wrong at the time of the commission of the offense.' " *Id.* at 964 (quoting Cal. Penal Code § 25(b)). By contrast, the lay definitions of "sane" include "proceeding from a sound mind," "rational," "mentally sound," and "able to anticipate and appraise the effect of one's actions." *Id.* at 966 (quoting Merriam Webster's Collegiate Dictionary 1035 (10th ed. 1998)). We explained that "if a jury is instructed that a defendant must be presumed 'sane' — that is, 'rational' and 'mentally sound,' and 'able to anticipate and appraise the effect of [his] actions,' — a reasonable juror could well conclude that he or she must presume that the defendant had no [ ] mental disease, defect, or disorder. If a juror so concludes, he or she presumes a crucial element of the state's proof that the defendant was guilty of [the requisite intent]." *Id.*

We also noted that the trial court did not give any special instructions to counter the likelihood that a reasonable juror would presume a crucial element of the state's proof. "Nowhere in his preliminary or concluding instructions did the judge explain that the presumption of sanity was the analytical basis for the bifurcated trial; nowhere did he provide the *M'Naghten* definition of insanity that the jury was asked to presume; and nowhere did he warn the jury that 'sane' was being used in something other than the conventional lay sense that the jurors were likely to have had in mind." *Id.* Under such circumstances, we held that the guilt phase instruction on the presumption of sanity violated the Due Process Clause of the Fourteenth Amendment and the California Court of Appeal's decision upholding the conviction was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Sandstrom* and *Francis*. *Id.* at 966-67.

**[3]** In this case, the presumption of sanity instruction given to the jury was, in all material respects, equivalent to the

instruction at issue in *Patterson*. As in *Patterson*, the only real issue at the guilt phase was whether petitioner had a mental disease, defect, or disorder that precluded him from forming the requisite specific intent: there was no dispute over what petitioner had done, only why he had done it. Also, as in *Patterson*, the jury was instructed at the conclusion of the guilt phase that petitioner was presumed sane. In fact, the jury here was instructed that petitioner was "conclusively presumed" to be sane. As in *Patterson*, the jury was not advised that the presumption of sanity was the analytical basis for the bifurcated trial, nor was it provided with a definition of "sane" or "sanity" that was to be conclusively presumed or warned that "sane" was being used in a manner other than the conventional lay sense. Yet it was asked to determine whether petitioner in fact had a mental defect or disorder. Consequently, *Patterson* controls on the issue of whether the giving of the instruction was error under clearly established federal law.

**[4]** Moreover, the instruction read as a whole did not explain or cure the error because the jury was not told how to reconcile the presumption of sanity with petitioner's attempts to prove he lacked the requisite intent to commit murder because of his mental condition. Thus, the potential for confusion was rife, and a reasonable juror could have concluded that he or she must presume that petitioner had no mental disease, defect, or disorder. As we noted in *Patterson*, "if a juror so concludes, he or she presumes a crucial element of the state's proof that [petitioner] was guilty of [the requisite intent]." *Patterson*, 223 F.3d at 966. The error in *Patterson* was thus repeated in this case. In fact, the error here was even more pronounced, as the charge told the jury that petitioner was "conclusively presumed" to be sane. Thus, the California Court of Appeal's decision that there was no error was contrary to, or involved an unreasonable application of, clearly established federal law.

## B.   The Harmless Error Standard

It is well-established that a petitioner is not entitled to relief under § 2254 if a constitutional error was harmless. *Patterson*,

223 F.3d at 967. Here, the California Court of Appeal concluded that *Patterson* was "distinguishable on its facts" and that, unlike the defendant in *Patterson*, "there [was] no possibility that [petitioner] was prejudiced by the court's instruction."

A federal court reviewing a state court decision in a habeas corpus proceeding "ordinarily should apply the harmless error standard . . . , namely whether the error had substantial and injurious effect or influence in determining the jury's verdict." *California v. Roy*, 519 U.S. 2, 5 (1996) (internal quotations omitted). When a court applying this harmless error standard "is in grave doubt as to the harmlessness of an error, the habeas petitioner must win." *Id.* at 5.

In *Patterson*, we found that the trial court's error in giving the presumption of sanity instruction was not harmless. *Patterson*, 223 F.3d at 967-68. In so holding, we observed, at the outset, that because Patterson's mental state was the "primary issue" in the guilt phase, "[a]ny presumption that would have relieved the state of its burden to prove a crucial element of such mental state necessarily played an important role in the jury's ultimate determination of guilt." *Id.* at 967.

**[5]** Here, as in *Patterson*, petitioner's mental state was the primary issue at the guilt phase of trial. Indeed, it was the only issue, as petitioner did not deny killing the victim. Petitioner presented a great deal of evidence of his mental state, including the testimony of two psychiatrists, each of whom testified that petitioner suffered from mental impairments at the time of the homicide. Based on this evidence, petitioner argued that he did not have the mental state necessary for first degree murder. The instruction that he was to be presumed "conclusively sane" relieved the state of its burden to prove that mental state, which was the crucial element of the crime. As in *Patterson*, this error necessarily played an important role in the jury's ultimate determination of guilt.

The California Court of Appeal, in finding harmless error, relied upon the fact that unlike in *Patterson*, the jury here was able to reach a verdict in the sanity phase. This, however, does not establish that the error here was harmless. Indeed, petitioner could be found to be legally sane, but nevertheless be found, by a properly instructed jury, to be suffering from a mental disease or defect such that he could not have formed the intent necessary for first or second degree murder. As the dissent pointed out in the California Court of Appeal's decision, on the facts of this case, a properly instructed jury could have convicted petitioner "of no more than voluntary or involuntary manslaughter." Moreover, the jury did take some time to make its decision here, going overnight before reaching a verdict. *Patterson* does not limit relief only to those cases that produce a hung jury in the sanity phase.

More importantly, the trial court here set aside the jury's verdict of first degree murder. Finding that the facts could not support such a verdict, the trial court reduced the conviction to second-degree murder. This finding that there was insufficient evidence of premeditation and deliberation established that the jury did not properly weigh the evidence and return a legally defensible verdict. Instead, its verdict was so against the facts that the trial court could not let it stand. If the jury could not properly weigh the facts and correctly apply the facts to the law, as evidenced by its first degree murder verdict, one cannot conclude that the same jury was not misled or confused by the presumption of sanity instruction.

In finding harmless error, the Court of Appeal also found it significant that the prosecutor and the defense counsel "vigorously debated" petitioner's mental state during their final arguments at the guilt phase of trial. This did not cure any error, however, because the arguments were made to a jury that was instructed to presume petitioner conclusively sane. The lively debate took place under the wrong ground rules. The jury weighed these arguments using the judge's charge, and that charge bluntly told them that petitioner was conclu-

sively sane, eliminating the requirement that the state prove petitioner's mental state.

[6] There is simply no basis for concluding that the vigorous debate of the attorneys somehow made clear to the jury that despite the presumption of sanity, they must consider petitioner's attempts to prove he lacked the requisite intent to commit murder because of his mental condition. Given the charge, a reasonable juror could have concluded that he or she was required to determine only whether petitioner was able to form the requisite intent if he was sane at the time, a question easily answered in the affirmative. As we noted in *Patterson*, if a juror so concludes, he or she ignores the possibility that petitioner had a mental disease, defect, or disorder and presumes that petitioner had the requisite intent, a crucial element of the state's proof. Indeed, there is nothing in the record to suggest that the jury disregarded the presumption of sanity charge and then went on to convict petitioner.

[7] We therefore have "grave doubt" as to the harmlessness of the erroneous instruction and believe that it "had substantial effect or influence in determining the jury's verdict." *Roy*, 519 U.S. at 5 (internal quotation omitted). Accordingly, petitioner is entitled to habeas relief because the constitutional error of the challenged jury instruction was not harmless.

## IV.  CONCLUSION

[8] We conclude that the jury instruction in this case violated the Due Process Clause of the Fourteenth Amendment and that the error was not harmless. Consequently, we REVERSE the district court's denial of Stark's habeas petition, and REMAND the case to the district court with instructions to grant the writ, unless the State of California grants Stark a new trial within a reasonable period to be set by the district court.

**REVERSED AND REMANDED.**