Filed 5/16/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ARCE HERRERA,<br><br>    Defendant and Appellant. | 2d Crim. No. B261842<br>(Super. Ct. No. BA397904-01)<br>(Los Angeles County) |

A jury convicted Richard Arce Herrera of first degree murder and found true an allegation that he personally used a weapon. (Pen. Code, §§ 187, subd. (a), 189, 12022, subd. (b)(1).)[1] The trial court sentenced him to prison for 26 years to life with 986 days of presentence custody credit. Herrera contends that the trial court violated his constitutional rights to a fair trial and to present a defense by improperly restricting the psychiatric testimony that he could introduce. We agree and reverse.

### FACTUAL BACKGROUND

*Prosecution Evidence*

Shortly before midnight, Herrera met up with his childhood friend, Bobby Khamvongsa, at Trunks, a bar in West Hollywood. Khamvongsa introduced his roommate, Diego Contreras, to Herrera. Herrera told Contreras that "he used to have the biggest crush on [Khamvongsa] back in high school." The three of them walked to the Abbey, a club down the street. Khamvongsa told Contreras that he and Herrera were

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

going to a club across the street and would meet up with him later.  After about 15 minutes, Khamvongsa texted Contreras that he was going home.

Around one hour later, Herrera walked into a CVS store near the clubs.  He purchased a steak knife, scissors, and a chocolate bar.  The knife was in a security package that required a sharp tool to open.  As Herrera spoke with the cashier, he had "a big smile on his face" and was "maybe even laughing."  He got into the car he had borrowed from his parents and drove away.

Shortly afterward, Herrera's car skidded to a stop at the corner of Orlando Avenue and Oakwood Avenue.  Witness Christie Samani saw Herrera chasing Khamvongsa south along Orlando but lost sight of them.  Herrera was about 5'10" tall and weighed about 210 pounds.  Khamvongsa was about 5'6" tall and weighed about 140 pounds.  Herrera returned to the car alone and drove to a location about 280 feet south of the intersection.

Witness Christiano Covino was a passenger in a car heading north along Orlando when he saw Herrera's car parked in the middle of the street.  There was a pool of blood underneath the car.  At first Covino thought Herrera was putting Khamvongsa into the car but then realized Herrera was pulling Khamvongsa out of the car.  Khamvongsa appeared unconscious.  Herrera placed him on the ground.  He kneeled over Khamvongsa and appeared to be performing CPR.  Herrera then got back in his car and drove off.

Khamvongsa died from blood loss after being stabbed 21 times.  He was stabbed six times in the chest, abdomen, and armpit area and eight times in the back.  He had defensive wounds on both hands.  The non-fatal stab wounds to his armpit and back were not deep, and he would have been able to run 280 feet after sustaining them.  The deeper stab wounds to his chest and back would have rendered him unable to move more than a few steps before collapsing.  His blood alcohol level was 0.13 percent.

Herrera drove to his parents' apartment 11 miles away in Eagle Rock.  He told his parents, "Help me.  I killed somebody."  He was shaking and crying and appeared "really scared."  He said he had been attacked and raped and that he killed in self-defense.

2

He showed his parents a wound on the right side of his stomach. He told his parents that "he wanted to get away" and asked for the address of their relatives in San Diego. He asked his father to help him remove the license plate on the car. He did not want to call the police.

After taking off his bloody clothes, Herrera told his parents to take them outside and burn them. While he took a shower, his father called 911. The police arrived and took Herrera into custody.

Herrera did not have any visible cuts or major injuries. He had an abrasion on his right front hip. It was bright red, circular in shape, and about two inches across. It was consistent with him banging against a hard, circular object, such as the automatic shift in the center console of a car, rather than a knife wound. Herrera did not complain of any pain and had no problem walking.

The police found Khamvongsa's bloody shorts in Herrera's parents' apartment. When the police searched Herrera's apartment, his computer was open to a search about rape and the "disciplines" of rape.

*Defense Evidence*

Herrera was born in the Philippines. He moved to Hawaii with his father when he was five years old and lived there until he was 20. His father was very strict. Sometimes, when his father used to drink, they would argue and his father would hit him.

When Herrera was eight years old, he joined a dance group led by Howell Mahoe. Before every concert, Mahoe would go into the boys' dressing room and massage Herrera's penis until he became erect. Mahoe molested Herrera more than 200 times over a three-year period. Herrera did not tell his parents about the sexual abuse at the time because he did not understand what was happening.

When Herrera was 15 years old, he met Santos Rosario, who was 10 years older, on a public bus he was taking to school. One evening Rosario took him to a gay bar in Waikiki and bought him a few drinks. After Herrera was drunk, Rosario took him to his (Rosario's) house and started undressing him. Herrera, who "was a virgin," repeatedly told Rosario, "no," but Rosario forced him to have anal sex. He did not

3

"realize the gravity" of what Rosario had done to him until years later when he was an adult.

Herrera next saw Rosario four years later when he was attending community college. Herrera and his father had been having "bad" arguments and Herrera was "looking to get out." When he ran into Rosario at a gay bar, Rosario offered to rent him a room in his house. After Herrera moved in, Rosario and his friends convinced him to smoke "crystal meth" by telling him it was marijuana. He stayed awake for three days. He fell asleep after taking a pill Rosario gave him. He regained consciousness for a few seconds, realizing he was naked and his hand was on Rosario's penis, but then "passed out again." When he awoke the next morning, his anus felt painful and there was blood and feces around it. He immediately moved back in with his parents.

A year later, Herrera was staying with Joseph Teig, his best friend at the time. Teig started using drugs and acting erratically. He made sexual advances, which Herrera rebuffed. Herrera suspected Teig had sold some of his belongings for drugs, which led to "a heated argument on the phone." When Herrera returned to their apartment, Teig walked up to Herrera's car and started punching him through the window. Herrera was bleeding all over his face. He "had never experienced ... such violence" and thought Teig was trying to kill him. "It brought back ... a flood [of] memories" of Rosario and Mahoe.

Herrera moved to Los Angeles to live with his mother. His father joined them a few months later. Over the next few years, Herrera attempted suicide three times. He "couldn't get over all the stuff that had happened to [him] since [he] was a kid." Eventually, he sought help at the Edelman Health Center, where he was treated by Dr. Kenneth Chuang.

On the day he met up with Khamvongsa and Contreras, Herrera was "in a panic" because he saw Teig's name and picture on Facebook as a friend suggestion based on their friends in common.[2] Herrera had felt that he "was getting [his] life back

---

[2] Facebook is an online service that among other things allows users to connect with their "friends"—other users who have accepted a "friend request." (Facebook, Info

4

together," but when he saw Teig he thought, "I can never get away from it." He went to his parents' house, and his mother helped him deal with the trauma by telling him to forget Teig and "move on with [his] life."

That evening, Herrera went to dinner with a few friends from the Filipino American Student Association (FASA) at California State University, Northridge. Afterwards, he called Khamvongsa, who told Herrera to meet him at Trunks and they would "hang out." When Herrera arrived, Khamvongsa was there with Contreras and another friend. Herrera told Contreras about his high school crush on Khamvongsa as "friendly, funny banter." He was no longer attracted to Khamvongsa and was dating someone else.

Khamvongsa asked Herrera to give him a ride home. Khamvongsa had been "drinking a lot" and was "wasted." On the way to the car they stopped at a video store. While they were browsing the video selection, Khamvongsa came up behind Herrera, grabbed his buttocks, and massaged them for about five seconds. This caused Herrera to panic because he was having flashbacks of the times that he was molested. He felt conflicted because he knew Khamvongsa was his friend but thought that Khamvongsa was "trying to do something" to him.

Herrera tried to "put [what had happened] out of his mind" as they walked back to the car. He thought about a FASA luau that he planned to attend the next day. He wanted to bring "Salisbury steak tips." In preparation, he thought that he should go to CVS to buy a kitchen knife and to Ralph's to buy some steak. They got into the car and Herrera drove to CVS. Herrera went inside while Khamvongsa waited for him.

<https://www.facebook.com/facebook/info> [as of Feb. 23, 2016]; Facebook, Help Center, Adding Friends & Friend Requests <https://www.facebook.com/help/ 360212094049906/> [as of Feb. 23, 2016].) Facebook users can search for other users to whom they want to send a friend request. (See Facebook, Help Center, Adding Friends & Friend Requests <https://www.facebook.com/help/360212094049906/> [as of Feb. 23, 2016].) In addition, Facebook makes suggestions to users about potential friends in a section labeled "People You May Know." (Facebook, Help Center, People You May Know <https://www.facebook.com/help/501283333222485/> [as of Feb. 23, 2016].) These suggestions are "based on mutual friends, work and education information, networks you're part of, contacts you've imported and many other factors." (*Ibid.*)

Herrera purchased the knife both to cook with and "just in case [he] had to defend [him]self." He purchased the scissors because the pair he already had was rusting. He used the scissors to open the knife packaging to make sure that the knife was sharp enough to chop steak. When he got back into the car, he placed the bag in the center console. The knife handle was sticking out.

As Herrera was driving to Khamvongsa's house, Khamvongsa pulled down his own shorts and placed his hand inside Herrera's pants on his penis. Herrera stopped the car and asked him, "What are you doing?" Khamvongsa said, "I thought you liked me." Herrera responded, "Yeah, maybe in high school. But, you know, I'm dating somebody now." Khamvongsa "kind of snapped" and started hitting himself on the head, saying, "What's wrong with me? Why doesn't anybody want to be with me[?]"

Herrera was about to respond when Khamvongsa grabbed the knife and lunged at him, grazing his right abdomen. The two struggled, and Herrera got ahold of the knife. He drove off in a panic. He "was reliving everything" and it was "like [Khamvongsa] became the three men who sexually abused [him] as a child." Herrera "went nuts" and started stabbing him.

When the car skidded to a stop, Khamvongsa punched Herrera, got out of the car, and ran. Herrera was in an "irrational state" and thought that Khamvongsa was trying to kill him. He ran after Khamvongsa. When he caught up to Khamvongsa, he "kept stabbing him." Herrera "was in a rage" and thought he was stabbing Mahoe and "everybody else." Khamvongsa fell down and Herrera continued to stab him. After a while, Herrera "woke up" and "the levity [*sic*] of what [he] had just done ... [sunk] in."

At first Herrera thought he would take Khamvongsa to a nearby hospital. He tried to put Khamvongsa in the back passenger seat but could not lift him. He performed CPR. In his panic, all he could think of was to go to his parents.

Herrera's computer search was from months earlier. He was looking up the statute of limitations and penalties in Hawaii for rape to "remind [him]self" that it was too late to prosecute Rosario and Mahoe.[3]

Dr. Chuang, a psychiatrist, diagnosed Herrera with post-traumatic stress disorder (PTSD) and treated him several times during the two years before the murder, the last time two weeks earlier. He did not think Herrera was malingering.

Dr. Nancy Kaser-Boyd, a clinical and forensic psychologist, explained that trauma is "the experience of an event that signaled either imminent possibility of death or great physical injury or sexual assault." She defined PTSD as "a set of symptoms that comes from the experience of trauma." PTSD has three categories of symptoms: (1) re-experiencing unwanted memories, such as nightmares and recollections based on triggers; (2) avoidance, such as forcing oneself to forget and developing a mistrust of others; and (3) hyperarousal, including trouble sleeping, hypervigilance to cues of danger, and quickness to anger. When a person who has been traumatized and is vigilant to danger perceives a threat, the person often has the same physiological reaction of fear experienced during the original trauma and prepares either to fight or flee.

Dr. Kaser-Boyd evaluated Herrera three times after the murder and reviewed his medical records, the police investigation reports, the autopsy report, Herrera's assault complaint against Teig, and newspaper accounts of Mahoe's molesting boys in the dance group. Herrera tested at five standard deviations above normal for anxiety-related disorders, including PTSD.[4] Kaser-Boyd did not believe he was malingering. She opined that he suffered from PTSD and major depressive disorder.

---

[3] The police media analysis report was admitted into evidence by the defense to corroborate his testimony. The exhibit is not in the appellate record.

[4] The "standard deviation" measures the variability of a distribution of test scores. In a population where test scores are distributed normally, i.e., in the familiar bell-shaped curve, approximately 68.3 percent of the population would obtain scores within one standard deviation of the average, approximately 95.4 percent of the population would obtain scores within two standard deviations of the average, and approximately 99.7 percent of the population would obtain scores within three standard deviations of the average. (See, e.g., Kaplan & Saccuzzo, Psychological Testing: Principles, Applications, and Issues (7th ed. 2009) pp. 40-54.)

DISCUSSION

Prior to Dr. Kaser-Boyd's testimony, the trial court ruled that "[s]he can testify as to various aspects of [PTSD], as to testing and things of that nature, but not anything related to mental state at the time of the commission of the offense." After Kaser-Boyd testified about PTSD generally and the results of Herrera's psychological testing, defense counsel asked her about a peritraumatic dissociative state. Kaser-Boyd stated that this "occurs in response to something extremely threatening that signals danger and possible harm." Someone experiencing this state might feel "emotionally distant, which is called detachment," or feel "like it [is] happening to someone else ..., which is called derealization."

Defense counsel asked Dr. Kaser-Boyd if she had an opinion "as to whether [Herrera] was suffering from [peritraumatic dissociative state]," "whether he was psychiatrically impaired," and "whether he suffered from [PTSD]" on the date of the murder. The prosecutor objected to all three questions. The trial court sustained the objections "based on what we talked about earlier."

Herrera contends that the trial court erred by excluding Kaser-Boyd from testifying about Herrera's psychiatric impairments at the time of the murder, denying him his Sixth and Fourteenth Amendment rights to a fair trial and to present a defense. In general, we review the trial court's exclusion of evidence for abuse of discretion. (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).) "But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773; see *People v. Marshall* (1996) 13 Cal.4th 799, 836 ["[A] criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor"].) We apply independent review to "mixed question determinations affecting constitutional rights." (*People v. Seijas* (2005) 36 Cal.4th 291, 304.) To the extent the trial court bases its evidentiary ruling on a conclusion of law, such as its conclusion here that the Evidence Code prohibits anything related to mental state at the time of the

8

killing, we review its conclusion de novo. (*People v. Walker* (2006) 139 Cal.App.4th 782, 795.)

Sections 28 and 29 limit the type of testimony experts may provide in criminal cases. Section 28 prohibits "[e]vidence of mental disease, mental defect, or mental disorder . . . to show or negate the *capacity* to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (Italics added.) Such evidence "is admissible solely on the issue of whether or not the accused *actually* formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (*Ibid.*, italics added.) Section 29 prohibits "any expert testifying about a defendant's mental illness, mental disorder, or mental defect" from discussing "whether the defendant had or did not have the required mental states ... for the crimes charged." That question is reserved for the trier of fact. (*Ibid.*)

Taken together, these sections "do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present." (*People v. Coddington* (2000) 23 Cal.4th 529, 583.) "Put differently, sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Cortes*, *supra*, 192 Cal.App.4th at p. 908.)

In *Cortes*, the trial court excluded expert opinion that the defendant "was in a dissociative state" or "had PTSD at the time" when he stabbed the victim repeatedly and then fled. (*Cortes*, *supra*, 192 Cal.App.4th at pp. 892, 899.) The Court of Appeal reversed, finding that such evidence was admissible and that the trial court abused its discretion by excluding it. The material facts here are indistinguishable.

9

Respondent attempts to distinguish *Cortes* on the basis that the trial court here "did not restrict Dr. Kaser-Boyd from testifying about her assessment of [Herrera's] psychiatric background and experiences."  It is true that the *Cortes* expert faced restrictions the expert here did not, namely being prohibited from testifying about the defendant's "history of emotional distress, including PTSD." (*Cortes*, *supra*, 192 Cal.App.4th at p. 900.)  *Cortes* focused not on those restrictions, however, but on the exclusion of expert testimony about the defendant's mental state at the time of the offense.  In *Cortes*, the Court of Appeal thought it was "clear" that "[t]he trial court abused its discretion in refusing to permit [expert testimony] about defendant's particular diagnoses and mental condition *and their effect on him at the time of the offense*." (*Id.* at p. 909, italics added.)  In answering "[t]he more difficult question[,] how much of [the expert's] testimony should the trial court have admitted," the Court of Appeal "start[ed] from the premise that, at a minimum, [the expert] should have been permitted to testify to defendant's [psychiatric] diagnoses" and "upbringing and traumatic experiences as a child and/or adolescent, inasmuch as defendant's prior traumatic experiences informed [the expert's] opinion." (*Id.* at pp. 909-910.)  Thus, the additional restrictions on the *Cortes* expert's testimony were not central to the holding.

Respondent further attempt to distinguish *Cortes* by arguing that Kaser-Boyd "was simply restricted in testifying that [Herrera] had a particular mental state at the time of the killing, as a result of his psychological condition."  But this misstates the scope of the trial court's ruling and ignores *Cortes*'s holding.  The trial court ruled that Kaser-Boyd could not testify about "*anything related* to mental state at the time … of the offense," not just Herrera's mental state itself.  Moreover, *Cortes* does not restrict testimony that the defendant had a particular mental state—only the particular mental state that is an element of the offense. (See *Cortes*, *supra*, 192 Cal.App.4th at p. 910 ["[A]s interpreted by the high court in *Coddington*, sections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions:  no testimony

10

on the defendant's capacity to have, or actually having, the intent required to commit the charged crime"].)

As in *Cortes*, respondent and our dissenting colleague "[rely] on dicta" in *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 "that an expert cannot offer any opinion that could be interpreted as 'tantamount' to testifying that defendant did not have the mental state required by the crime charged, or had a state of mind that is the opposite of, or necessarily negates, the existence of the required mental state." (*Cortes*, *supra*, 192 Cal.App.4th at p. 910.) We reject respondent's attempt to equate testimony "that [Herrera] was in a peritraumatic dissociative state on the night of the killing" with testimony "that [he] lacked the specific intent to kill, or premeditate, deliberate, or harbor malice aforethought, when he stabbed Khamvongsa." In *Cortes*, even "the Attorney General agree[d]" that the expert "should have been permitted to testify that in [his] opinion, defendant entered a dissociated state." (*Id.* at p. 911.)

"The gist of [respondent's] complaint about Dr. [Kaser-Boyd's] proposed testimony is that it would have given the jury a basis to *infer* that [Herrera] actually did not harbor malice, premeditate, or deliberate, even if Dr. [Kaser-Boyd] did not come out and say that [he] lacked such mental states. That is exactly right. However, such testimony is not 'clearly prohibited by sections ... [28] and 29.' On the contrary, it is exactly the type of testimony sections 28, 29, and the case law, permit. In all of the cited cases, evidence was presented from which the jury could have properly inferred, from testimony that fell short of expressing an opinion that the defendant lacked the specific intentional state required for the charged crime, that the defendant actually lacked such intent. The limits placed by the trial court on Dr. [Kaser-Boyd's] testimony were unduly restrictive and an abuse of discretion." (*Cortes*, *supra*, 192 Cal.App.4th at p. 912.)

In concluding otherwise, the trial court and the dissent rely on *People v. Pearson* (2013) 56 Cal.4th 393 (*Pearson*). The defendant in that case "repeatedly threatened to 'do a 101 California,' referring to the infamous 1993 massacre of numerous employees in a law office located at 101 California Street in San Francisco." (*Id.* at p. 403.) Defense counsel asked the expert psychologist whether the defendant's threats

11

"indicated he 'thought' about committing a '101 California' before the murders."  (*Id.* at p. 442.)  The trial court sustained an objection that defense counsel "was improperly trying to elicit the expert's opinion on an ultimate question of fact for the jury—*i.e.*, whether defendant killed the victims with premeditation and deliberation."  (*Ibid.*)

The Supreme Court held that "[t]he trial court acted within its discretion in finding that the question ... essentially asked the expert to provide an opinion about the required mental state (premeditation and deliberation) and thus was improper under section 29."  (*Pearson*, *supra*, 56 Cal.4th at p. 444.)  We see no contradiction between this holding and *Cortes*.  In *Pearson*, as in *Nunn*, defense counsel improperly attempted to procure an expert's opinion couched "in words which are or would be taken as synonyms for the mental states involved."  (*People v. Nunn*, *supra*, 50 Cal.App.4th at p. 1364.)  Pearson's expert, however, was allowed to "testif[y] about his mental state at the time of the [killings]" and opined that he was suffering from, among other things, "chronic [PTSD]."  (*Pearson*, *supra*, at p. 407.)  Herrera's expert should have had the same opportunity.

The error was prejudicial.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Since Herrera admitted killing Khamvongsa, the only issue was his mental state at the time of the killing.  "[T]he trial court's ruling effectively eviscerated any defense [he] had to premeditated and deliberated murder.  By prohibiting any testimony about [his] mental condition, the court's ruling robbed Dr. [Kaser-Boyd's] testimony of any relevance it might otherwise have had, since it left the jury no basis to infer that [Herrera] had lapsed into a dissociated state in which he might not have deliberately premeditated the infliction of [21] wounds on the victim.  The court's ruling also prevented the jury from properly evaluating evidence that would have been relevant to its consideration of the self-defense, imperfect self-defense and heat of passion instructions given here."  (*Cortes*, *supra*, 192 Cal.App.4th at p. 912.)

"The prosecutor took full advantage of the court's ruling in closing argument."  (*Cortes*, *supra*, 192 Cal.App.4th at p. 912.)  He stressed that premeditation and deliberation should be inferred from the number of stab wounds on Khamvongsa and

12

the fact that Herrera chased after Khamvongsa. "In response to the defense argument that a dissociative state explained why [Herrera did these things], the court's ruling allowed the prosecutor to argue that there was no alternative explanation for [his] infliction of [21] stab wounds, except premeditation and deliberation." (*Ibid.*) The prosecutor rhetorically asked the jury, "Where is the sudden quarrel? Where is the threat to [Herrera's] life[?] Where is his threat of great bodily injury? Nothing." He repeatedly told the jury that PTSD "is not a defense" and that "[n]owhere in those instructions does it say anything about [PTSD] so don't be fooled. It's just a side show." The prosecutor also undermined Dr. Kaser-Boyd's test results by eliciting testimony from her that Herrera's PTSD could have arisen from the murder itself rather than beforehand.

"The case for premeditated and deliberated murder, as opposed to second degree murder or voluntary manslaughter, was not overwhelming …. [Herrera] and the victim had no history of animosity before that night." (*Cortes*, *supra*, 192 Cal.App.4th at p. 913.) Respondent points out that Herrera "suffered no significant injuries" and fled the scene of the crime, but the same was true in *Cortes*.[5] (*Id.* at p. 883.) It is conceivable that a person whose PTSD symptoms were triggered, causing him to kill his longtime friend based on actual but objectively unreasonable perceptions, would panic afterwards and choose not to call the police. Herrera testified that in traumatic moments he turned to his parents for help. He also testified, corroborated by an eyewitness, that he attempted to administer CPR to Khamvongsa after realizing what he had done. This supports Herrera's theory that he attacked his friend while under a dissociative, PTSD-induced fog.

---

[5] In *Cortes*, the victim undisputedly was not the aggressor. (*Cortes*, *supra*, 192 Cal.App.4th at p. 913.) Here, Herrera testified that Khamvongsa sexually assaulted him and then lunged at him with the knife. Even if the jury did not entirely believe Herrera's version of events, it still may have found that Herrera's acts were a product of PTSD rather than premeditation and deliberation if Dr. Kaser-Boyd had testified about how PTSD likely affected him on the night of the murder. Regardless, there is a substantial likelihood that the jury's evaluation of his credibility would have been influenced by the excluded psychiatric evidence. (Cf. *People v. Ramirez* (2016) 244 Cal.App.4th 800, 821 [improperly admitted expert gang testimony likely colored jury's credibility determination].) The prosecutor repeatedly urged the jury to focus on the physical evidence, but the jury's three requests for testimony were all for Herrera's testimony.

Other circumstantial evidence, such as Herrera's purchase of the knife and Khamvongsa's shorts being off, were consistent with Herrera's plausible version of events.

The prosecution's evidence of motive was weak. Its theory was that Herrera planned to rape Khamvongsa and, when that failed, Herrera killed him—"a sexual assault gone wrong." But there are obvious shortcomings to this theory. The attack happened quickly, in just a few minutes. The prosecution's theory required the jury to believe that Herrera started raping Khamvongsa from the driver's seat of his car at the intersection of two public streets, and did so either while he was driving or after dramatically stopping the car with "a lot [of] noise" that sounded like a "crash" to a nearby resident inside her home. Psychological testing showed that Herrera had no abnormal tendencies of aggression or antisocial behavior. His scores fell within a standard deviation of the average.

This is not to say that the evidence is insufficient to support a first degree murder conviction. It is, and Herrera does not dispute that. The problem lies in Herrera's inability to present the critical evidence in support of his only defense: expert testimony explaining how his past history of trauma was likely to affect his mental state at the time of the offense. He had a right to present this evidence. "Under *Watson* [46 Cal.2nd 818], we find it reasonably probable that [Herrera] would have obtained a more favorable result if the jury had been permitted to hear about his ... mental condition on the day of the offense. Therefore, we will reverse on this ground." (*Cortes*, *supra*, 192 Cal.App.4th at p. 913.)

### DISPOSITION

The judgment is reversed.

<u>CERTIFIED FOR PUBLICATION</u>

PERREN, J.

I concur:

GILBERT, P. J.

14

YEGAN, J., Dissenting:

I respectfully dissent.

Until today, it was settled that a mental health expert may not give testimony that the defendant did or did not form the mental state required for the crime charged. (Pen. Code, § 29; *People v. Pearson* (2013) 56 Cal.4th 393, 443; *People v. DeHoyos* (2013) 57 Cal.4th 79, 121; *People v. Halvorsen* (2007) 42 Cal.4th 379, 408; *People v. Coddington* (2000) 23 Cal.4th 529, 583, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn 13.)[1] Here, defense counsel asked his expert, Dr. Nancy Kaser-Boyd, whether appellant was "psychiatrically impaired" and suffered from P.T.S.D. and a peri-traumatic dissociative state the day of the killing. The trial court sustained objections based on section 29 and *People v. Pearson, supra*, 56 Cal.4th 393. Before the questions were asked, the court ruled that Dr. Kaser-Boyd "cannot testify as to what [appellant's] mental state was at the time of the evening in question. She can testify as to various aspects of P.T.S.D., as to testing and things of that nature, but not anything related to mental state at the time of the commission of the offense."

The majority opinion says that the ruling "robbed" Dr. Kaser-Boyd's testimony of any relevance it might have had with respect to appellant's mental state at the time of the murder. (Op. at p. 12.) Based on the majority opinion's construction of the law, defense counsel can evade section 29 by asking a mental health expert whether the defendant, on the day he committed the criminal act, had a state of mind which is the opposite of and negates the existence of the mental state required for the charged crime. That is the very thing section 29 prohibits. (See e.g., *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327 [section 29 prohibits hypothetical questions that might be interpreted to call for ultimate opinion about mental state]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 827 [section 29 focuses on whether defendant actually formed a mental

---

[1] All statutory references are to the Penal Code unless otherwise stated.

state that is an element of the charged offense]; *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1365 [expert precluded from testifying that defendant fired weapon impulsively].)

Defense counsel initially wanted to ask the doctor whether appellant was psychiatrically impaired "at the time of the killing." After the trial court ruled that section 29 prohibits such a question, counsel changed the time frame and asked whether appellant was psychiatrically impaired "the day of the killing." Borrowing on *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), the majority opinion holds that such a question is permitted because it is indirect evidence of mental state from which the jury could "infer" that appellant did not intend to kill or premeditate. (Op. at p. 11.) That type of question is prohibited by section 29. *Cortes* holds that section 29 does not bar expert testimony about a defendant's diagnosis and mental condition, "*or how that diagnosis or condition affected him at the time of the offense*, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Id.*, at p. 908, italics added.) In my view, *Cortes* was wrongly decided and should not be followed.

*"Day of the Killing" Question*

The majority opinion seizes on the phrase "*how that diagnosis or condition affected him at the time of the offense*" to mean that Dr. Kaser-Boyd could opine on whether appellant was so psychiatrically impaired that appellant was unable to form the intent to kill. This violates section 29. Expert testimony that appellant was psychiatrically impaired "at the time of the killing" could reasonably be construed by the jury to mean that appellant did not harbor malice, premeditate, or intend to kill. (See e.g., *People v. Halvorsen* (2007) 42 Cal.4th 379, 408 [prosecution asked defense mental health expert whether the evidence supported a psychiatric defense; jury could have understood the testimony to be the functional equivalent of testimony that defendant had intent to kill].) Changing the time frame of the question to the "day of the killing" does not make the expert testimony any more admissible or take it outside section 29. "It would be

2

simple to hold, as appellant suggests we do, that as long as a defense expert avoids the use of the legal name of the mental state in question, the testimony is admissible. Under such a rule it would be improper for a defense psychiatrist to testify that a defendant did not 'premeditate and deliberate' but would be proper to testify he did not 'plan' his actions. This, however, would be mere game playing." (*People v. Nunn, supra*, 50 Cal.App.4th at p. 1364.)

So too here. Rephrasing the question to ask whether appellant was psychiatrically impaired the day of the killing violates section 29 and solicits testimony tantamount to an opinion that appellant did not harbor malice or the intent to kill. "[S]ection 29 does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted. An expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved. Nor may an expert evade section 29 by offering the opinion that the defendant at the time he acted had a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state." (*Ibid*.)

*Harmless Error*

The majority opinion says that the evidence supports the first degree murder conviction but holds that appellant was denied the right to present his only defense: expert testimony explaining how appellant's past history of P.T.S.D. "*was likely to affect his mental state*" at the time of the killing. (Op. at p. 13.) But that misstates the question that was asked. Dr. Kaser-Boyd was asked whether appellant "was psychiatrically impaired on May 19, 2012" and whether "he suffered from P.T.S.D. on that day." The trial court did not abuse its discretion in sustaining the objection. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663 [section 29 rulings reviewed for abuse of discretion]; *People v. Nunn, supra*, 50 Cal.App.4th at p. 1363 [section 29 does not deprive defendant of right to present a defense].)

3

The alleged error, if any, in limiting Dr. Kaser-Boyd's testimony was harmless. (*People v. Halvorsen, supra*, 42 Cal.4th at p. 408-409.) Dr. Kaser-Boyd testified that appellant suffered from peri-traumatic dissociation manifested by a sense of unreality, detachment, and derealization when appellant was sexually assaulted in 2004 and before and after the killing in 2012. At trial, appellant admitted killing the victim but said he was afraid of the victim and overcome with P.T.S.D. symptoms of paranoia, harm, and disassociation when the victim grabbed his buttocks. Despite this fear and "disassociation," appellant agreed to give the victim a ride and stopped at a CVS where appellant bought a knife and scissors to open the boxed knife. Laughing and smiling, appellant returned to the car and, seconds later, stabbed the victim and chased him almost 300 feet, stabbing him several more times. His theory of defense was put to the jury.

The majority opinion speculates that, but for the order limiting Dr. Kaser-Boyd's expert testimony, the jury could have inferred that appellant did not harbor malice or intend to kill when he stabbed the victim 21 times. The jury saw it differently and was instructed that an expert opinion is only as good as the facts and reasons on which it is based. (CALJIC 2.80.) Had the "day of the killing" question been asked, it is not reasonably likely that appellant would have received a more favorable verdict. I would affirm the judgment.

CERTIFIED FOR PUBLICATION.


YEGAN, J.



4

Ronald S. Coen, Judge

Superior Court County of Los Angeles

_____

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.