Filed 7/20/22  P. v. Jones CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060938 |
| v. | (Super. Ct. No. 19CR00783) |
| DAVID JONES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Cruz County, Syda K. Cogliati, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Amit Kurlekar, Deputy Attorneys General, for Plaintiff and Respondent.

Over a four-year span, appellant David Jones relentlessly hounded a prominent NASA astronomer in a failed attempt to win her affection. Although she repeatedly told appellant to leave her alone, he deluged her with phone calls and online messages and repeatedly tried to contact her in person. At his trial for stalking and sending annoying communications, appellant contended he lacked the requisite intent to harass or scare the victim. The jury convicted him as charged, and he was sentenced to five years' probation.

On appeal, he contends: 1) The trial court prejudicially erred in excluding expert testimony that he suffers from a delusional disorder that may have affected his ability to understand the victim was not in love with him, 2) the exclusion of this testimony warranted a mistrial because defense counsel promised it to the jury in his opening statement, 3) his probationary term must be reduced in light of recent legislation, and 4) two of his probation conditions are vague and overbroad.

As to the first issue, respondent concedes it was error to exclude the expert testimony on appellant's mental condition, and we agree. However, we find the error was harmless because it is not reasonably probable appellant would have obtained a more favorable verdict had his expert witness been allowed to testify.

As to the second issue, we find the trial court properly denied appellant's motion for a mistrial. In addition, we reject appellant's backup argument that his trial attorney was ineffective for promising expert testimony that was ultimately excluded from the trial.

As to the third issue, the parties agree the length of appellant's probation term must be reduced from five years to two years. Therefore, we reverse the trial court's sentencing order and remand the matter for resentencing. Given this disposition, we need not consider appellant's challenge to his current probation conditions. We thus affirm the judgment in all other respects.

# FACTUAL AND PROCEDURAL BACKGROUND

## *Prosecution's Evidence*

Natalie Batalha is a renowned astronomer who had a prominent role in NASA's Kepler Mission, which was launched in 2009 to explore the possibility of life on other planets. In addition to leading the mission's science team, Batalha managed its Facebook account and participated in numerous press conferences to keep the public apprised of Kepler's progress. Around 2015, she accepted appellant's friend request on Facebook, thinking he was just one of the many people who were interested in the Kepler Mission. However, she soon realized he had other designs.

In May 2015, appellant attended a lecture Batalha gave in New York City, and during the event she agreed to have her picture taken with him and his soon-to-be ex-wife. Although that encounter went fine, appellant sent Batalha a follow-up message on Facebook saying he found her very attractive, could not stop thinking about her, and wanted to have a close relationship with her. In the message, appellant also promised not to bother Batalha again if she felt he was coming on too strong. Nonetheless, when Batalha told appellant she was married and not interested in having a personal relationship with him, he continued to send her affectionate messages. He also sent her personal gifts and flooded her with emails and phone calls at work, despite her repeated requests that he leave her alone.

In December 2015, appellant sent a Christmas card to Batalha's home and called her there, even though she had never given him her address or phone number. She told appellant his actions were inappropriate and unwelcome, but he did not relent. Despite acknowledging his actions were making Batalha feel uncomfortable and less desirous of him, his behavior only got worse.

In December 2016, appellant flew from his home in New Jersey to California, where Batalha lived. He suggested they meet at a book-reading event in Los Altos that she was planning to attend; instead she contacted a NASA security agent who

3

persuaded appellant not to attend the event. Subsequently, Batalha sent appellant an email saying she considered his actions to be hostile. Appellant replied, "You, your family and NASA have my sincerest apologies for any and all of my actions that may have made you feel harassed or uncomfortable in any way. I take full responsibility for my own actions."

Nevertheless, a few months later, appellant showed up at a lecture Batalha attended in San Francisco. He tried to contact her at the event, but when she saw him walking toward her, she hurried to her car and drove away. The incident left Batalha shaken and distraught. She informed NASA security about it, and they warned appellant to stay away from her, but she continued to live in fear, not knowing what he would do next.

In September 2017, appellant moved to Manteca, California, which was not far from Batalha's home and where her parents owned a vineyard. After that, appellant started calling Batalha and demanding that they meet in person. He also gave Batalha directions to places in the area where he said he'd be waiting for her. Her response was to begin carrying pepper spray and varying her driving routes.

Throughout this time, appellant continued to send Batalha gifts and contact her on Facebook.[1] Batalha did not have the energy or inclination to respond to all of appellant's messages, but when she did, she accused him of stalking her and reiterated her lack of interest in him. Appellant responded by saying that he felt hurt by her rejection. He also apologized to Batalha, but as was often the case, his apology quickly turned to anger, blame and resentment, leaving Batalha feeling even more worried and afraid.

In the fall of 2018, Batalha left NASA to take a job as an astrophysics professor at UC Santa Cruz. A few days later, she received a message from appellant

---

[1] Appellant had to use fake accounts to do so because Batalha blocked his real account.

4

saying he intended to enroll at the school as a physics major. Appellant told Batalha he was not trying to make her feel uncomfortable in any way, yet he also suggested the situation would "escalate" if she did not agree to meet with him.

When Batalha refused, appellant tried to force a meeting at a conference she attended at UC Santa Cruz with her daughter. At the event, appellant approached Batalha and asked if they could talk, but she said no and promptly left the building. Two days later, Batalha responded to an email from appellant by telling him to stop contacting and following her. However, Batalha was doubtful appellant would stop his menacing behavior, so she contacted the police.

Investigators discovered appellant had over 100 photos of Batalha on his computer and had conducted numerous internet searches for her, as well as her family, home, and workplace. They also learned appellant had researched the stalking laws in California and New Jersey and that he spent much of his time in the Santa Cruz area upon arriving in California.

*Appellant's Testimony*

Appellant testified he was madly in love with Batalha and never intended to cause her any harm. He said his attraction to her started when she began working on the Kepler Mission. As a science buff himself, he contacted her through Facebook, and they amicably exchanged several messages pertaining to the mission. However, after he told her that he had a crush on her, things got weird.

Although Batalha repeatedly told appellant she was not interested in having a romantic relationship with him, he was not convinced of this for two main reasons. First, Batalha posted items on her social media accounts that related to subjects that she and appellant had talked about or gifts that he had given her. Appellant believed these postings were "breadcrumbs" that Batalha was leaving for him to let him know that she was actually very interested in him.

5

Second, appellant was getting Facebook messages from a person identified as Naruna Souza (as well as other people) who seemed to know things that he and Batalha had discussed. Although these people had no connection to Batalha, appellant believed they were actually her and that she was using fake names and accounts to secretly contact him so she would not get in trouble at work or with her husband. According to appellant, Souza even told him in one of her messages that she was Batalha. Souza also told appellant to send her things and go to California, which is why he sent Batalha gifts and attempted to contact her there.

However, during his testimony, appellant also admitted harboring doubts as to whether Souza was in fact Batalha. He also admitted many of his messages to Batalha were unwelcome. In fact, in some of those messages, appellant explicitly recognized he was making Batalha feel worried and afraid. He also acknowledged Batalha did not share the same feelings he had for her, which made him feel frustrated and angry.

*Proposed Expert Testimony and Mistrial Motion*

Following appellant's testimony, the trial court held an Evidence Code section 402 hearing on the admissibility of testimony from appellant's proposed expert witness, Carolyn Murphy, Ph.D. Dr. Murphy is a clinical psychologist who was retained by defense counsel to evaluate appellant and offer her opinion about his conduct in this case. At the 402 hearing, she testified appellant has a psychological disorder known as erotomania that likely contributed to his actions toward Batalha.

Dr. Murphy explained erotomania is a delusional disorder in which the person holds a fixed belief that another person is in love with him, even in the face of contrary evidence. She posited that even though appellant knew Batalha was telling him she was not interested in him romantically, he nevertheless believed she loved him. This delusional belief stemmed from appellant's mistaken belief that Batalha was trying to send him messages through fake social media accounts that she was still interested in him, despite her many statements indicating otherwise.

6

Defense counsel argued Dr. Murphy's proposed testimony was relevant to whether appellant harbored the specific intent to annoy, harass, or scare Batalha, which was the central issue in the case. However, relying on the rule that a defendant cannot argue mistake of fact based on a delusional belief, the trial court ruled Dr. Murphy's testimony was inadmissible.

At that point, defense counsel moved for a mistrial. Because he had alluded to Dr. Murphy's testimony during his opening statement to the jury, he argued it would be fundamentally unfair to continue the trial if the court was not going to allow her to testify. The trial court disagreed and denied the motion. After the defense rested its case, the court instructed the jurors, "[T]here had been an indication earlier in the trial that another defense witness might be called, and that witness is not going to testify and you are not to speculate about why or draw any kind of inference from the fact that there's [*sic*] no additional defense witnesses."

### *Verdict and Sentence*

The jury convicted appellant of one count each of making annoying phone calls and stalking. (Pen. Code, §§ 653m, subd. (b), 646.9, subd. (a).) The trial court sentenced appellant to five years' probation, subject to various conditions. Among other things, the conditions limit appellant's use of social media and require him to comply with remote computer monitoring from his probation officer.

### DISCUSSION

### *Exclusion of Dr. Murphy's Testimony*

Appellant contends the trial court erred in refusing to allow Dr. Murphy to testify on his behalf. Respondent agrees, and so do we. The only disputed question is whether that error was harmless. For the reasons explained below, we believe it was.

In excluding Dr. Murphy's testimony, the trial court relied on a line of cases that prohibit a defendant from relying on a mistake-of-fact defense when the alleged mistake arises from purely delusional thinking, i.e., when the defendant harbors a

7

false belief with no basis in reality. (See *People v. Elmore* (2014) 59 Cal.4th 121; *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437.) However, those cases do not apply when the defendant's mistaken impression has an objective correlate. (*People v. Elmore, supra*, 59 Cal.4th at p. 137 [explaining a defendant who mistakes a stick for a snake would be entitled to put on a mistake-of-fact defense, whereas a defendant who sees a snake where there is nothing snake-like would not].)

The objective correlate here was the Facebook messages that appellant received from Naruna Souza and other people during the time he was communicating with Batalha. Because those messages actually existed, respondent concedes appellant's case does not come within the rule prohibiting a mistake-of-fact defense based on purely delusional thinking. (See *People v. Schuller* (2021) 72 Cal.App.5th 221, 232-232, review granted Jan. 19, 2022, S272237 [trial court should have instructed on mistake-of-fact defense since the alleged mistake was grounded in objective circumstances and was not derived solely from the defendant's own thoughts].)

Respondent also admits Dr. Murphy's testimony was permissible under Penal Code sections 28 and 29, which limit the scope of expert testimony related to the defendant's mental condition. Those sections bar an expert from testifying about whether the defendant had the capacity to form, or actually formed, the specific intent required for the charged offense. (*People v. Nieves* (2021) 11 Cal.5th 404, 440-441.) But they do not prohibit expert testimony on how the defendant's particular mental condition may have impacted his or her ability to form such intent. (*Ibid*.) Thus, while Dr. Murphy would not have been allowed to testify that appellant did not have the specific intent required for the charged offenses, or that he was incapable of forming such intent, she should have been permitted to testify about appellant's erotomania and how it may have affected his thinking at the time of the charged offenses. (*Ibid*.; *People v. Cortes* (2011) 192 Cal.App.4th 873, 908.) Therefore, the trial court erred in excluding Dr. Murphy's testimony altogether.

That brings us to the issue of prejudice. Appellant contends the exclusion of Dr. Murphy's testimony must be reviewed under the *Chapman* standard applicable to federal constitutional error because her testimony was pivotal to his defense that he did not possess the specific intent required for the charged offenses. (*Chapman v. California* (1967) 386 U.S. 18.) Under that standard, reversal is required unless the reviewing court determines the error was harmless beyond a reasonable doubt. (*Id*. at p. 24.)

However, the exclusion of Dr. Murphy's testimony did not prevent appellant from presenting evidence to support his lack-of-intent defense. In fact, appellant himself testified extensively that he believed Batalha wanted to have a romantic relationship with him. Because the trial court's ruling with respect to Dr. Murphy did not result in the complete exclusion of evidence intended to establish appellant's defense, the *Chapman* standard does not apply. (*People v. Jones* (2012) 54 Cal.4th 1, 68; *People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203; *People v. Cunningham* (2001) 25 Cal.4th 926, 999; *People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *People v. Herrera* (2016) 247 Cal.App.4th 467, 478; *People v. Cortes, supra,* 192 Cal.App.4th at p. 912.) Instead, the ruling is subject to review under the standard applicable to ordinary evidentiary error, meaning reversal is not required unless it is reasonably probable appellant would have received a more favorable outcome had Dr. Murphy been allowed to testify at his trial. (*Ibid.*, relying on *People v. Watson* (1956) 46 Cal.2d 818, 836.)

That standard has not been met in this case. In Dr. Murphy's opinion, appellant was operating under an alternative belief system, due to his erotomania. So, even though Batalha repeatedly told him his advances were unwelcome and unwanted, he did not believe that was true, and therefore, he did not subjectively intend to annoy, harass, or scare her. However, the problem with this theory is that appellant's own messages to Batalha show he was well aware his actions were causing her extreme emotional distress and that she did not share the feelings he had for her.

9

For example, in one of the messages appellant called Batalha a "selfish bitch" and a "conceited narcissist" for denying him the love that he wanted from her. And in another message, he plainly told Batalha, "I understand that you do not reciprocate my feelings[.]" This made appellant feel "very alone, overwhelmed [and] frustrated," as he put it in a letter to Batalha. He accused her of ruining his life for rejecting him and bemoaned the possibility he would never find a woman who loved him. He also apologized to Batalha for badgering her and making her feel afraid.

These statements eviscerated the defense he now asserts was a winner. Because appellant's own words proved he knew otherwise, the exclusion of Dr. Murphy's testimony could not have prejudiced him. Indeed, it seems extremely unlikely the jury would have credited Dr. Murphy's testimony given how anguished and upset appellant was over Batalha's rejection of him and his explicit recognition that she *did not* love him. Therefore, it was harmless error for the trial court to exclude her testimony. (*People v. Jones, supra,* 54 Cal.4th at pp. 63-67 [exclusion of expert testimony on how defendant's alleged mental disorder may have affected his thinking processes was not prejudicial given appellant's own statements reflecting he intended to commit the charged offenses]; compare *People v. Herrera, supra,* 247 Cal.App.4th at pp. 478-480 [exclusion of psychiatric testimony bearing on the defendant's mental state was prejudicial given dearth of evidence showing his intent to commit the charged offenses]; *People v. Cortes, supra,* 192 Cal.App.4th at pp. 912-913 [same].)

*Denial of Mistrial Motion*

Appellant contends the trial court should have granted his request for a mistrial after excluding Dr. Murphy's testimony because his attorney had promised it to the jury in his opening statement. Alternatively, he asserts his attorney was ineffective for promising evidence that was never introduced at trial. Neither claim has merit.

By way of background, the record shows that after Dr. Murphy examined appellant and reviewed the records in the case, she prepared a pretrial report for defense

10

counsel that was geared toward appellant's suitability for diversion. Defense counsel then sent a copy of the report to the prosecutor stating that he intended to call Dr. Murphy as an expert witness at trial.

In response, the prosecutor filed a motion in limine for an evidentiary hearing pursuant to Evidence Code section 402. Not knowing exactly what Dr. Murphy intended to testify about at trial, the prosecutor expressed concern that some of the information in her report was inadmissible in that it reflected her opinions about appellant's specific intent at the time of the alleged offenses. The prosecutor requested a hearing on the scope of Dr. Murphy's testimony to prevent any improper opinions from being presented to the jury at trial.

At the hearing on the motion, the trial court deferred ruling on the prosecutor's request for a 402 hearing on Dr. Murphy's testimony. However, it stated the request "seems appropriate so that we can kind of all understand what the scope of the testimony is going to be . . . ."

Jury selection commenced three days later. During voir dire, both sides questioned the prospective jurors about whether they believed a person's mental illness could ever mitigate or excuse their criminal conduct. Defense counsel also raised the prospect of calling Dr. Murphy to offer her insights on appellant's state of mind at the time of the alleged offenses.

Defense counsel went even further in his opening statement. He told the jury he was going to call Dr. Murphy as an expert witness, and she was going to explain how she diagnosed appellant with erotomania and how that disorder may have contributed to appellant's erratic behavior in this case.

However, two days into the trial, the prosecutor filed a supplemental motion to exclude Dr. Murphy's testimony altogether. The motion was based on the prosecutor's understanding Dr. Murphy intended to testify that in pursuing Batalha, appellant was acting under a delusional belief that she was really in love with him. The

11

prosecutor challenged this opinion as improper, contending any delusional beliefs appellant may have had were irrelevant to whether he intended to commit the charged offenses.

Following appellant's testimony, the trial court held a hearing on the admissibility of Dr. Murphy's testimony and listened to her proposed testimony outside the presence of the jury. The court ultimately excluded Dr. Murphy's testimony for the reason offered by the prosecution, and that triggered a mistrial motion by the defense, which the court denied. However, as set forth above, the court also admonished the jury not to speculate as to why the defense did not call Dr. Murphy as a witness or draw any inferences from its failure to do so.

Appellant argues the court's admonishment was insufficient under the circumstances and that the court should have granted his motion for a mistrial. However, absent indications to the contrary, the jury is presumed to understand and follow all instructions from the court. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) That presumption is a crucial underpinning of our constitutional system of trial by jury. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) And there is nothing in the record that indicates the jury failed to heed the court's admonishment in this case.

Moreover, "[t]he law is clear: A motion for a mistrial should only be granted when the defendant's chances of receiving a fair trial have been irretrievably damaged. [Citation.] '"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.]' [Citation.] Unless the trial court's ruling is '"arbitrary, capricious or patently absurd,"' we are powerless to disturb it. [Citations.]" (*People v. Garcia* (2014) 229 Cal.App.4th 302, 311.)

Appellant argues a mistrial was required because without Dr. Murphy's testimony, defense counsel was unable to develop his lack-of-intent defense. However, that's what appellant's testimony was all about. During his testimony, he explained how

12

he misconstrued Batalha's social media posts as "breadcrumbs" and how he came to believe that she was trying to communicate with him on Facebook using fake accounts so they could carry on a secret relationship. This testimony paved the way for a good-faith jury instruction from the court.[2] And it permitted defense counsel to argue to the jury that appellant lacked the requisite intent to annoy, harass or scare Batalha.

Granted, the defense was not permitted to call Dr. Murphy to explain in psychological terms what she believed was motivating appellant's behavior. However, the jury was fully aware of the factual circumstances underlying appellant's lack-of-intent defense. Indeed, it was plainly evident from appellant's testimony that he may have had delusional notions regarding Batalha's feelings toward him. Considering everything the jury heard – including the trial court's admonishment not to infer anything from Dr. Murphy's absence from the trial – the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

As a backup argument, appellant contends his attorney was ineffective for talking about Dr. Murphy during voir dire and promising her testimony to the jury during his opening statement. (See generally S*trickland v. Washington* (1984) 466 U.S. 668 [the Sixth Amendment guarantees criminal defendant's the right to competent representation at trial].) Appellant contends it was unreasonable for defense counsel to bring up Dr. Murphy at that time since the trial court had yet to make any definitive rulings about her testimony. However, before the evidentiary phase of the trial began, the prosecution was only challenging the scope of Dr. Murphy's testimony, not its admissibility. It was not until appellant took the stand that the prosecution changed tack and sought to exclude Dr. Murphy's testimony in its entirety.

Under those circumstances, it was not unreasonable for defense counsel to raise the possibility of Dr. Murphy testifying during voir dire or in his opening statement.

_____

[2] The instruction prohibited the jury from convicting appellant if it believed he contacted Batalha in good faith.

13

At that time, he had every reason to believe Dr. Murphy would be allowed to testify in some respect. The fact that subsequent, unforetold events led to the complete exclusion of Dr. Murphy's testimony is not something he could reasonably have anticipated. We do not think he can be faulted for how he proceeded. (See *U.S. ex rel. Hampton v. Leibach* (7th Cir. 2003) 347 F.3d 219, 257 [a defense attorney's failure to fulfill promises he made to the jury regarding the introduction of certain evidence may be justified when unexpected developments preclude the presentation of such evidence]; *People v. Burnett* (2003) 110 Cal.App.4th 868, 884 [intervening circumstances warranted defense counsel's failure to present evidence he promised during opening statement].)

*Sentencing Issues*

Appellant was sentenced to five years' probation in February 2020. Since then, the Legislature enacted Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2), which limits felony probation terms to two years in most cases. (See Pen. Code, § 1203.1, subds. (a) & (m).) Respondent concedes this change applies to appellant because his case is not yet final. (*People v. Schulz* (2021) 66 Cal.App.5th 887, 895; *People v. Sims* (2021) 59 Cal.App.5th 943, 964.) Therefore, we will reverse appellant's sentence and remand for resentencing.

This disposition moots appellant's challenge to his original probation conditions. Indeed, since the length of his probation must be reduced by three years, he may have already successfully completed his probationary term. Thus, on remand, the trial court must not only reduce appellant's probationary term as part of resentencing, it must also determine his probationary status. (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1095; *People v. Lord* (2021) 64 Cal.App.5th 241, 246; *People v. Sims, supra,* 59 Cal.App.5th at p. 964.) Because this may result in the termination of appellant's probation or a modification of his original conditions, we need not consider his challenge to those conditions.

14

DISPOSITION

Appellant's sentence is reversed, and the matter is remanded for resentencing consistent with the views expressed herein.  In all other respects, the judgment is affirmed.


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


GOETHALS, J.


SANCHEZ, J.