Filed 9/25/20  P. v. Ruiz-Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. GERARDO OSCAR RUIZ-LOPEZ, Defendant and Appellant. | F077922 (Super. Ct. No. 16CR-04656) **OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Jeanne Schechter, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

After defendant Gerardo Oscar Ruiz-Lopez threatened his ex-girlfriend by phone that he and their daughter were dead, police found them alive in a bedroom closet with two leaking propane tanks. Defendant pled not guilty and not guilty by reason of insanity. During the guilt phase of the bifurcated trial, the jury convicted defendant of attempted premeditated murder (Pen. Code, §§ 664/187/189; count 1)[1] and child abuse likely to produce great bodily harm or death (§ 273a, subd. (a); count 2).[2] During the second trial phase, the jury found that defendant was legally sane at the time he committed the crimes. (§ 1026, subd. (a).) The trial court imposed a sentence of life with the possibility of parole for attempted premeditated murder and the upper term of six years for child abuse, stayed under section 654.

On appeal, defendant requests remand for a hearing on his eligibility for mental health pretrial diversion under section 1001.36. (Stats. 2018, ch. 34, § 24, pp. 34–37.) Defendant also claims that the trial court committed error under state law when it instructed the jury during the guilt phase that he is presumed sane, in contravention of *People v. Mills* (2012) 55 Cal.4th 663 (*Mills*), and that the erroneous instruction violated his federal constitutional rights by shifting the prosecutor's burden of proof. Finally, defendant claims that the trial court erred in limiting the scope of his expert witnesses' testimony about mental illness, in violation of his rights under state and federal law, and that cumulatively, these errors violated his right to due process and a fair trial.

The People dispute defendant's entitlement to any relief on his claims.

After briefing was complete in this case, the California Supreme Court held in *People v. Frahs* (2020) 9 Cal.5th 618, 624–625 (*Frahs*) that section 1001.36 is

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The jury found the sentence enhancement allegations for personal infliction of great bodily injury on a child under the age of five years, attached to counts 1 and 2, not true. (§ 12022.7, subd. (d).)

retroactive. As there is evidence in the record that defendant suffers from a qualifying mental disorder, he is entitled under *Frahs* to a conditional limited remand to determine whether he is eligible for pretrial diversion. (*Ibid.*) However, we conclude that to the extent *Mills* is controlling on the facts of this case and the trial court's curative instruction was erroneous under state law, it was harmless and we reject the claim that the instruction violated defendant's due process rights. We also reject defendant's claim that the trial court abused its discretion in limiting the scope of Dr. Terrell's and Dr. Blak's testimony during redirect examination, and his claim of cumulative error.

## FACTUAL SUMMARY[3]

### I. Prosecution Case

Defendant and F.N. lived together for approximately five or six years and they had a daughter together. In December 2015, F.N. told defendant she wanted to break things off. In response, defendant threatened to harm or kill their daughter, A.R. However, A.R. was not harmed and the responding officer concluded that F.N. was lying about danger to the child. F.N. left the house and A.R. remained there with defendant. F.N. testified that was the first time defendant made threats and his subsequent threats were always directed at harming or killing A.R. rather than herself.

During their relationship, F.N. denied observing mood swings or depression in defendant, but she said he drank a lot of beer, sometimes all day long. F.N. described the situation as "awkward, but not crazy" due to his drinking. After they broke up, defendant said he was depressed and F.N. offered to help.

F.N. also testified that during their relationship, defendant would tell her objects were moving in the house, but she never saw anything moving or anything that had been moved. On one occasion, F.N. had a dream she was being strangled and when she awoke

---

[3] Defendant's claims on appeal are limited to guilt phase issues and therefore, we do not include a summary of the sanity phase evidence.

and told defendant, he said, "'I seen it. I seen it[,]'" and he described something black going inside the wall. He also said he felt something on top of him, but she did not see anything.

After they broke up, defendant and F.N. shared custody of A.R. On July 10, 2016, A.R. was with defendant. He called and sent "aggressive" texts to F.N. throughout the day. He called her a "'whore,'" said A.R. was dead, and demanded to know if F.N. was with another man. F.N. testified that she did not pay much attention until that night, when defendant texted that she no longer had a daughter, that they were both dead and that they went to the mountains. She described the texts as "really strange" and after she recorded several of defendant's phone calls, she called the authorities from her location in Ceres but was told she needed to make the report in Merced. F.N. then asked her mother by phone to make the report and she drove to defendant's house in Merced.

When police arrived at defendant's house at approximately 10:30 p.m. to investigate, no one responded when they knocked and announced themselves. After kicking the door in, four officers entered and began clearing the rooms. The house was dark and quiet. When they reached the second floor master bedroom, one of the officers pushed the closet door open and was met with a strong odor of propane. Defendant and A.R. were lying on the closet floor with their eyes closed. There were pillows, blankets, toys, a computer tablet in a pink case and two Pez candy dispensers on the floor of the closet, along with two propane tanks that were leaking gas from their cut hoses.

One of the officers grabbed A.R., who was completely limp, and carried her outside. The remaining officers attempted to take defendant into custody, but they ran from the house when they heard a beeping sound, concerned it might be a detonator or the gas might otherwise ignite. The beeping was later determined to be from defendant's cell phone.

4.

A.R. quickly regained consciousness once outside and she was handed over to F.N. before being transported to the hospital. She was released in the morning and suffered no injury other than a cough, which F.N. described as rough and recurrent.

After A.R. was removed from the house, defendant remained inside for another hour or two before coming out. He was taken into custody and transported to the hospital.

Defendant was interrogated at the hospital and the audio recording of his interrogation was played for the jury. Defendant stated he and F.N. were trying to get back together, but he found out she was still talking with another man and he told her he was tired of it. He denied he used drugs or was on any medication, but he said he drank 12 or so beers that night. Defendant stated he was told he was found in his closet with his daughter and tanks of propane, but he had no memory of it and he denied any memory of repeatedly sending texts or making calls to F.N. that day. Officer Russell, who interrogated defendant at the hospital, testified that defendant did not appear to be under the influence of drugs or alcohol.

## II.    Defense Case

### A.    J.U.'s Testimony

J.U., a pastor who had known defendant for more than 10 years, testified that sometimes people lose consciousness and open themselves up to the spirit world. He stated that people who practiced black magic or witchcraft had called on him to expel demons before. People who prayed to the dead, but then turned to church also called on him for help, and he had to burn down their altars of "holy death."

J.U. testified that defendant consulted him regarding "some dark things" happening that related to demons. Defendant told J.U. that "[t]hey felt a horrible presence in one of the rooms" and A.R. "would have a dialogue with [the] spirit" in there. Defendant also told J.U. that they moved out of that apartment due to the spirit.

**B.     Dr. Terrell's Testimony**

Dr. Howard Terrell, a forensic psychiatrist, reviewed case-related material from the district attorney, the police department and Dr. Hamm, a psychologist; he reviewed the transcript of defendant's phone conversation with F.N. and listened to the call; he reviewed the transcript of defendant's interrogation; and he met with defendant and evaluated him.  During the evaluation, defendant denied using street drugs, but said that for two or three years prior to his arrest, he was drinking between 12 and 24 beers per day, which Dr. Terrell described as evidencing "a very serious alcohol problem." Defendant reported that in his youth in Mexico, he felt people talked about him and laughed at him, and he was on an unspecified medication.  He also reported having auditory hallucinations on and off for years during which he heard whispering and someone call his name, and having visual hallucinations over the past several years during which he saw shadows and ghosts.  He believed his mother-in-law engaged in witchcraft against him, and he reported engaging in witchcraft to protect himself.

In addition, defendant reported experiencing periods of euphoria and elevated energy since his 30's, and he said he could go for up to five days without needing sleep. During these periods, defendant experienced racing thoughts, rapid speech and dramatically increased productivity; he felt much stronger, more powerful and exceptionally optimistic; and he believed he would become wealthy.  Defendant related experiencing periods of depression with decreased energy and feelings of worthlessness and although he was offered psychiatric treatment at the jail, he declined it.  Dr. Terrell testified that defendant's history raises red flags, and he observed that in contrast with healthy people, defendant frequently went off on tangents without any logical transition, requiring redirection back to the topic of discussion.

After evaluating defendant, Dr. Terrell diagnosed him with bipolar I disorder and unspecified alcohol-related disorder, and he thought defendant might have schizoaffective disorder, but did not have enough evidence to conclude so with medical

6.

certainty. Dr. Terrell saw no evidence of malingering, which he explained is the false production of physical or psychiatric problems for secondary gain.

Dr. Terrell testified that bipolar disorder, or manic depression, is a brain disorder that may be inherited or caused by a brain injury. Its hallmark is one or more episodes of mania, often manifested by elevated mood and energy levels. People often experience rapid thoughts, can go days without sleep, and have impaired judgment, insight and impulse control. They "may be unusually funny and tell jokes that may or may not make sense, or they can become incredibly angry, hostile, violent, [or] even homicidal." People may also become psychotic during a manic episode and see or hear things that are not there, or they may become delusional with "fixed and unshakeable thoughts" and "paranoid beliefs [that] people are out to get them or kill them …."

As well, people with bipolar disorder may experience depressive episodes where they feel extremely down and suicidal; they may experience a mixture of both mania and depression; and they may often experience periods of normalcy even without treatment. Dr. Terrell described the disorder as "very complex" with "a very high risk factor for becoming suicidal." A person's level of impairment will necessarily depend on how manic or depressive the person is and whether alcohol or street drugs are a factor.

Dr. Terrell noted that in the phone call recorded by F.N., defendant's speech was "very, very rapid and pressured" and, in his opinion, it "is highly suggestive of someone who is mentally ill." Defendant's speech was also abnormally rapid and pressured during Dr. Terrell's interview with him, and Dr. Terrell opined that one possible explanation for defendant's speech in the phone call with F.N. is bipolar disorder in the manic phase. Another explanation might be that defendant was under the influence of a stimulant such as methamphetamine or cocaine. However, based on defendant's history and his observations of defendant during their interview, Dr. Terrell thought the most likely explanation for defendant's angry, hostile, rapid speech during the phone call was bipolar disorder during a manic phase. Dr. Terrell explained that making repeated phone calls

and sending repeated texts throughout the day is also consistent with an abnormal state of mind and bipolar disorder in the manic phase; people in this phase can become "hyper verbal," and talk rapidly, make a lot of phone calls, or send a lot of letters or texts. Dr. Terrell testified that if defendant had been drinking, even greater impairment of his judgment, insight and impulse control would be expected, and drinking 12 to 36 beers a day indicates "someone with a very serious drinking problem, … who's at high risk of having episodes of very abnormal behavior, including episodes of alcohol blackout …."

Defendant reported that he drank "'a lot'" of beer on the day of the crime, that it "usually takes at least 12 or more beers for him to black out," and that hours were unaccounted for, including the time of the crime. While acknowledging it is possible defendant was lying, Dr. Terrell stated that his inability to account for blocks of time is consistent with an alcohol blackout. In Dr. Terrell's opinion, on the day of the crime, defendant "was very likely intoxicated" and "very likely had bipolar [I] disorder with manic symptoms, … likely [with] some depressive symptoms, which were mixed in leading to him feeling suicidal as well as homicidal."

On cross-examination, Dr. Terrell testified that he did not hear what sounded like slurred speech during defendant's phone call with F.N., and that someone who is enraged and making threats can be acting purely out of anger. Dr. Terrell also explained that people in a manic phase are capable of making decisions and forming intent, but if one is severely mentally ill and in a manic phase or is drunk, or both, their judgment is faulty.

### C.     Dr. Blak's Testimony

Dr. Blak, a forensic psychologist, evaluated defendant twice in person and reviewed the police reports, Dr. Terrell's report, Dr. Neufeld's report, the recorded phone calls and interrogation, and the crime scene photographs. Dr. Blak observed that defendant was hypomanic, meaning he had high tempo, pressured, rapid speech and he moved from topic to sometimes only vaguely connected topic. Dr. Blak observed some anxiety, tension and worry, but no particular depression.

Defendant related that he preferred to be alone and was in lockdown at the jail by choice. He told Dr. Blak his mother was stern and abusive, physically and emotionally, and she sometimes hit him with a belt or other object. Defendant experienced bad dreams involving his mother, and he reported having a psychiatric consultation at some point, but did not indicate he was prescribed medication or had ongoing treatment. Defendant reported seeing disembodied hands around F.N.'s throat and seeing shadows. He also mentioned good and bad magic, and reported that spirits moved things in his house, he felt them and he believed they were responsible for the tension in his relationship with F.N. On the advice of someone he consulted, he lit candles and went to the cemetery to pray to the spirits.

Defendant told Dr. Blak he loved his daughter and a week before the crime, he, F.N. and A.R. went to Disneyland together. He thought they had a good time and was optimistic for a reconciliation with F.N., representing to Dr. Blak that F.N. wanted to get back together and she communicated that to him. Defendant also told Dr. Blak he drank a 12-pack of beer every day and he did not have a criminal record.

Dr. Blak did not see any sign that defendant was malingering, and he diagnosed defendant with chronic bipolar disorder with severe mania. His testimony regarding bipolar disorder was materially consistent with Dr. Terrell's testimony. Dr. Blak noted that defendant's moods appeared to cycle rapidly between high and low even within the span of a day; and that repeatedly calling and texting a girlfriend after the end of a relationship is characteristic of a manic episode, as was defendant's agitation and anger during his phone conversation with F.N. Dr. Blak interpreted defendant's phone conversation with F.N. as focused on finding out if she was with someone else, and his anger and language reflected his "mixed attachment" to her, which was due to his unstable upbringing.

Dr. Blak also diagnosed defendant with substance use disorder and undifferentiated schizophrenia. He explained schizophrenia is a thought disorder that

9.

includes auditory and visual hallucinations, delusions and "ideas as reference," in which the person will attribute a meaning to an event that has no logical connection; that is, a mere idea to support the person's thinking. Dr. Blak testified that defendant's reports of seeing something black go into the wall, seeing his daughter talk to someone who is not there and seeing disembodied hands choking his girlfriend are consistent with schizophrenia; and his belief that his girlfriend wanted to reconcile with him when she did not is consistent with delusional thinking. He also testified that rage over a partner leaving for someone else or being with someone else can be a triggering event for schizophrenia or psychosis.

Dr. Blak testified that psychosis and schizophrenia are interchangeable words, and a person can experience a psychotic break due to trauma, such as abandonment by someone the person is attached to, or due to chemical ingestion, such as methamphetamine use. Thought disorders like schizophrenia result in impaired judgment, including illogical interpretations and angry or agitated reactions to a perceived threat. Thought disorders also impact the ability to weigh options and appreciate the consequence of actions.

Dr. Blak attributed defendant's inability to recall the events on the day of the crime, other than his recollection that he ordered pizza, to a fugue or dissociative state during which awareness is blocked. Dissociative states can be the product of significant trauma or of chemical ingestion, but they are also a component of schizophrenia, which Dr. Blak believed was the situation with defendant. He explained that when people with a thought disorder act contrary to their beliefs, the disorder causes an impairment in their observational ability and they block the act out, in contrast with consciously lying about the act. If they do something "syntonic, that is, fits with what they believe about themselves, they have no problem. However[,] when [they do something] dystonic, or different from what they believe about themselves, then they [have] to do something about the conflict, like[,] '[W]hat do I do about this. Either I admit that I'm not the

10.

person I think I am, or I didn't do it.'" Dr. Blak testified that defendant said he does not feel guilty because he loves his daughter. However, those two things do not go together, and defendant's contradictory statement follows from his feeling of guilt and is the product of his thought disorder and dissociative state.

In addition to a fugue or dissociative state attributable to schizophrenia, Dr. Blak opined that defendant's angry, agitated behavior during the recorded phone call with F.N. on the day of the crime evidenced someone in the manic phase of bipolar disorder. Dr. Blak also opined that these disorders affected defendant's judgment on the day of the crime.

On cross-examination, Dr. Blak agreed that if someone says something untrue, such as expressing a belief in reconciliation, that statement might be a lie or made to save face and is not necessarily the result of a delusion or false belief. However, in his opinion, making a victim comfortable in the closet with a pillow—a loving gesture coupled with a hurtful gesture on the opposite end of a spectrum—evidences delusional thinking. He also testified that "rage has to do with aggression [toward] others," and when people act out of rage during a manic phase, they want to act and intend to act, but they do not think of the consequences and do not, in their mind, have a choice. That is, they have control, but do not feel they do, and they act compulsively and impulsively.

## DISCUSSION

### I.     Remand Request for Eligibility Determination Under Section 1001.36

Defendant was convicted on May 9, 2018, and sentenced on July 27, 2018. Effective June 27, 2018, the Legislature added section 1001.36 to the Penal Code. (Stats. 2018, ch. 34, § 24, pp. 34–37.) Pursuant to section 1001.36, certain defendants suffering from mental disorders may be eligible for pretrial diversion (*id.*, subds. (a), (b)), which is defined as "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment[]" (*id.*, subd. (c)). "If the

11.

defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).)

There is evidence in the record that defendant suffers from a qualifying mental disorder under subdivision (b)(1)(A) of section 1001.36. Relying on the Court of Appeal's decision in *People v. Frahs*, which held that section 1001.36 applies retroactively to all judgments not yet final on appeal, defendant seeks remand for a determination on his eligibility for diversion under section 1001.36. (*People v. Frahs* (2018) 27 Cal.App.5th 784, 791, review granted Dec. 27, 2018, No. S252220.) In their brief, the People argue that *People v. Frahs* was wrongly decided and section 1001.36 is not retroactive.

After briefing was complete in this case, the California Supreme Court affirmed the decision in *People v. Frahs* and held that under the rule of *In re Estrada* (1965) 63 Cal.2d 740, section 1001.36 is retroactive. (*Frahs*, *supra*, 9 Cal.5th at p. 624.) In light of *Frahs* and evidence that defendant suffers from a qualifying mental disorder, defendant is entitled to a conditional, limited remand for an eligibility determination under section 1001.36. (*Frahs*, *supra*, at p. 625.) Pursuant to the procedure adopted in *Frahs*, "'[i]f the trial court finds that [the defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [the defendant] successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [the defendant] does not meet the criteria under section 1001.36, or if [the defendant] does not successfully complete diversion, then his convictions and sentence shall be reinstated.'" (*Id.* at p. 641.) As remand is conditional, we turn to defendant's remaining claims.

## II. Instructional Error

### A. Background

Prior to the commencement of evidence during the guilt phase, both parties gave opening statements. During defendant's opening statement, the following exchange occurred:

> "[DEFENSE COUNSEL:] [W]hen he … learned [F.N.]'s already with another guy, this jealous, hatred, disappointment, depression comes from this falling out triggered psychosis. And when he's in manic psychosis, you'll hear from testimony of [a] professional that his mind is not sane.
>
> "[PROSECUTOR]: I'm going to object to sanity.
>
> "THE COURT: Sustained.
>
> "[DEFENSE COUNSEL]: "He suffers from mental illness that will impair his judgment, impair his knowing what can happen to people of his actions. And this mental illness will cause him to do things that he doesn't intend to do. [¶] So when you hear all this evidence, you will see that he didn't have specific intent to kill his loving daughter, and you will hear evidence that he's never been in trouble in his life. He never had intent to kill his daughter with premeditation, deliberation. And that's what evidence will show to you. And your righteous verdict will be not guilty. Thank you."

Immediately following, the court held a bench conference at the prosecutor's request and then instructed the jury:

> "All right. Ladies and gentlemen, I do just want to remind you this is just the guilt phase of the jury trial. For this portion of jury trial, you do need to presume that the defendant is sane[. T]he only issue is whether he's guilty of these crimes. If you find that he is guilty of one or both of these crimes, then we'll get to the next phase of trial where we'll be examining the issue regarding his sanity. Okay. I just want to remind you [of] that."

Relying on the California Supreme Court's decision in *Mills*, defendant claims that the trial court's instruction to the jury was error under state law, that the error also violated his right to due process by shifting the prosecutor's burden of proof, and that the

13.

error was prejudicial under both the state and federal standards of review. Alternatively, defendant argues that if trial counsel failed to adequately preserve this issue for review, he rendered ineffective assistance of counsel.

The People contend that defendant forfeited his claim of instructional error by withdrawing any objection to the curative instruction during the conference that followed the court's admonishment to the jury. With respect to the merits, they concede that the trial court committed error under state law when it instructed the jury to presume defendant's sanity, but they contend the error did not violate defendant's due process rights and it was harmless under the state standard of review.

As explained below, we reject defendant's claim that the trial court committed an instructional error of constitutional magnitude and we conclude that even if erroneous under *Mills*, the instruction did not prejudice defendant. Therefore, we need not resolve the parties' disagreement over whether defendant forfeited his claim of instructional error. (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

**B.    Standard of Review**

We review allegations of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.) "If the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (per curiam).) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

### C.    Analysis

#### 1.    Error Under State Law

In *Mills*, during the guilt phase of a bifurcated trial, the trial court instructed the jury, at the prosecutor's request and over defense counsel's objection, that "'[f]or the purpose of reaching a verdict in the guilt phase of this trial, you are to conclusively presume that the defendant was legally sane ….'" (*Mills*, *supra*, 55 Cal.4th at pp. 676, 678–679, fn. 10, italics omitted.)  Although the California Supreme Court found the error was harmless (*id.* at p. 681), it concluded that instructing the jury on the presumption of sanity during the guilt phase was error under state law because it "had no bearing on any issue before the jury at the guilt phase of [the] defendant's trial[,]" and "[t]the instruction is susceptible to the interpretation that the presumption of sanity is relevant to the jury's guilt phase deliberations.  That reading is inconsistent with the bifurcated scheme established by section 1026, which requires the prosecution to prove guilt before the defendant assumes the burden of proving insanity[]" (*id.* at p. 676).  However, the court rejected the argument that the error violated the defendant's due process rights (*id.* at pp. 676–677), finding "there [was] no reasonable likelihood that the jury would have applied the presumption of sanity to reduce the prosecutor's burden of proof[]" (*id.* at p. 680).

In contrast with *Mill*s, where the trial court instructed the jury after the close of evidence and in conjunction with its other final instructions on the law, the trial court here admonished the jury that the defendant is presumed sane during the guilt phase after defense counsel commented during his opening statement that the jury would hear evidence that defendant was *not* sane.  As such, the isolated instruction was directly responsive to and intended to cure an affirmative error made by defense counsel, and it was not repeated during the final instructions given after the close of evidence.  The context in which the instruction was given in this case is, therefore, distinguishable from the concerns that informed the decision in *Mills*; namely, the pertinence of the instruction

and whether it "complicates matters at the guilt phase by injecting the subject of sanity before it is at issue." (*Mills*, *supra*, 55 Cal.4th at p. 680, fn. omitted.)

In any event, we need not decide whether the curative instruction violated state law even under the circumstances of this case, because, as we discuss below, even if we assume error, it was not prejudicial. Before we turn to prejudice, however, we resolve defendant's claim that the error he complains of also violated his right to due process under federal law.

### 2. Due Process Claim

In arguing a due process violation occurred, defendant urges us to follow the Ninth Circuit Court of Appeal's decisions in *Patterson v. Gomez* (2000) 223 F.3d 959 (*Patterson*) and *Stark v. Hickman* (2006) 455 F.3d 1070 (*Stark*). Defendant acknowledges that *Mills* declined to do so, but contends that the California Supreme Court distinguished *Patterson* and *Stark* on grounds present in *Mills* but absent in this case. (*Mills*, *supra*, 55 Cal.4th at p. 677.)

#### a. *Patterson*

In *Patterson*, the defendant, who had a history of mental illness, ran onto a freeway and into the pathway of a semitruck with his 10-year-old daughter in his arms. (*Patterson*, *supra*, 223 F.3d at p. 961.) His daughter was killed and, during the guilt phase of the bifurcated trial, the jury convicted him of first degree murder. (*Id.* at pp. 961–962.) The trial court instructed the jury at the conclusion of the guilt phase as follows:

> "Evidence has been received regarding a mental disease or mental disorder of the defendant at the time of the crime in the Information. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in the Information, and are [sic] found in the definitions of murder.
>
> "If from all the evidence you determine to be credible you have a reasonable doubt whether the defendant formed any required mental state

16.

or had the necessary specific intent, you must find that he did not have such mental state or specific intent.

"*At the time of the alleged offense charged in the Information, you were* [*sic*] *instructed to presume that the defendant was sane*." (*Patterson*, *supra*, 223 F.3d. at p. 964.)

The Ninth Circuit concluded that the instruction violated the due process clause of the Fourteenth Amendment by shifting the prosecutor's burden of proof on an element. (*Patterson*, *supra*, 223 F.3d at p. 965.) The court explained, "Where, as here, evidence is introduced at trial that a defendant was suffering from a mental disease, defect, or disorder, the jury is entitled to consider evidence of such disease, defect, or disorder in determining whether the defendant actually had the mental state necessary for first degree murder. But if a jury is instructed that a defendant must be presumed 'sane'—that is, 'rational' and 'mentally sound,' and 'able to anticipate and appraise the effect of [his] actions,'—a reasonable juror could well conclude that he or she must presume that the defendant had no such mental disease, defect, or disorder. If a juror so concludes, he or she presumes a crucial element of the state's proof that the defendant was guilty of willfulness, premeditation, and deliberation." (*Id.* at p. 966.)

In considering the sanity instruction in the context of the other instructions, the *Patterson* court concluded it violated due process, stating, "Nowhere in his preliminary or concluding instructions did the judge explain that the presumption of sanity was the analytical basis for the bifurcated trial; nowhere did he provide the *M'Naghten* definition of insanity that the jury was asked to presume; and nowhere did he warn the jury that 'sane' was being used in something other than the conventional lay sense that the jurors were likely to have had in mind." (*Patterson*, *supra*, 223 F.3d at p. 966.) After finding that the trial court committed an instructional error of constitutional magnitude, the court expressed "'grave doubt'" that the error was harmless. (*Id.* at p. 968.)

17.

###### b. *Stark*

Subsequently, in *Stark*, a first degree murder case in which the defendant shot and killed his estranged wife's boyfriend (*Stark*, *supra*, 455 F.3d at pp. 1072–1074), the trial court instructed the jury:

> "*In the guilt phase of a criminal action the defendant is conclusively presumed to be sane*; however, you have received evidence regarding a mental defect or mental disorder of the defendant at the time of the commission of the crime charged, namely, murder of the first degree, murder of the second degree, or the lesser crime thereto, namely, voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought which are an element of the crime charged, namely murder of the first degree, murder of the second degree, or the lesser crime of voluntary manslaughter." (*Stark*, *supra*, 455 F.3d. at p. 1075.)

The court concluded that the instruction was equivalent in all material respects to the erroneous instruction given in *Patterson* and that *Patterson* was controlling. (*Stark*, *supra*, 455 F.3d at p. 1078.) The court stated, "[T]he instruction read as a whole did not explain or cure the error because the jury was not told how to reconcile the presumption of sanity with [the] petitioner's attempts to prove he lacked the requisite intent to commit murder because of his mental condition. Thus, the potential for confusion was rife, and a reasonable juror could have concluded that he or she must presume that [the] petitioner had no mental disease, defect, or disorder. As we noted in *Patterson*, 'if a juror so concludes, he or she presumes a crucial element of the state's proof that [the petitioner] was guilty of [the requisite intent].' *Patterson*, 223 F.3d at 966. The error in *Patterson* was thus repeated in this case. In fact, the error here was even more pronounced, as the charge told the jury that [the] petitioner was '*conclusively* presumed' to be sane." (*Ibid.*, italics added.) As in *Patterson*, the *Stark* court concluded that the instructional error was not harmless. (*Id.* at p. 1080.)

### c. *Mills*

Defendant correctly asserts that in *Mills*, in which the defendant claimed unreasonable self-defense, the California Supreme Court distinguished *Patterson* and *Stark* on the ground that unlike in those cases, the "defendant did not claim that his mental illness resulted in 'diminished actuality,' i.e., a general absence of the requisite mental state. His claim was narrower and less directly related to considerations of sanity, in the lay sense, than were the defenses in *Patterson* and *Stark*." (*Mills*, *supra*, 55 Cal.4th at p. 677, fn. omitted.) Moreover, the court in *Mills* specifically stated that it was expressing "no view on whether *Patterson* and *Stark* were correctly decided." (*Ibid.*, fn. 8.)

However, the *Mills* court also recognized that in *People v. Blacksher*, which did not involve a claim of unreasonable self-defense, it had summarily rejected the claim that the trial court lowered the prosecutor's burden of proof, in violation of the defendant's due process rights, by instructing the jury, ""[I]n the guilt trial or phase of this case, the defendant is conclusively presumed to have been sane at the time[] the offenses … are alleged to have been committed[]"" (*Mills*, *supra*, 55 Cal.4th at p. 675, fn. omitted, quoting *People v. Blacksher* (2011) 52 Cal.4th 769, 831 (*Blacksher*) [following *People v. Coddington* (2000) 23 Cal.4th 529, 584–585 (*Coddington*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13]). In rejecting the defendant's due process claim in *Blacksher*, the court commented that it was "neither persuaded nor bound by any contrary decisions of the lower federal courts." (*Blacksher*, *supra*, at p. 831; see *People v. Brooks* (2017) 3 Cal.5th 1, 90 ["We are not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight."].)

Defendant points out that this case does not involve the narrow defense claim of unreasonable self-defense as in *Mills* and instead involves the broader "general absence of the requisite mental state[]" as in *Patterson* and *Stark*. (*Mills*, *supra*, 55 Cal.4th at

p. 677.)  However, we reiterate that *Blacksher* did not involve a claim of unreasonable self-defense, and "'[c]ourts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.  It is not their function to attempt to overrule decisions of a higher court.'"  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198, quoting *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  In any event, we are not persuaded that in this case, the court's curative sanity instruction lowered the prosecutor's burden of proof as to mental state.  To the contrary, the distinctions discussed with respect to state law error also inform our conclusion that there was no violation of defendant's due process rights.

In contrast with the instructions in *Stark* and *Patterson*, the trial court here instructed the jury on mental impairment pursuant to standard pattern instruction and did not mention the presumption of sanity, as follows:

> "You have heard evidence that the defendant may have suffered from a mental disorder.  You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime.

> "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state specifically—I can't even talk any more.  I'm sorry ladies and gentlemen.  It's getting late.  The specific intent to kill [A.]R.  If the People have not met this burden, you must find the defendant not guilty of attempted murder as charged in Count 1.  The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically deliberation and premeditation as alleged in the additional allegation.

> "If the People have not met this burden, you must find the defendant not guilty of the additional allegation that the attempted murder was done willfully, deliberately, and with premeditation."  (See CALCRIM No. 3428.)

The trial court did not, in combination with these instructions, repeat that the jury must presume defendant's sanity.  Under the circumstances of this case and viewing the

instructions in their entirety, defendant fails to persuade us that the isolated instruction on the presumption of sanity, which was given prior to the commencement of evidence, was intended to cure defense counsel's inadvertent error during opening statement, and was not repeated by the court during final instructions, shifted the prosecutor's burden of proof by confusing the jury and creating the risk that a reasonable juror might conclude he or she must presume defendant had no mental disorder.[4] (*Stark*, *supra*, 455 F.3d at p. 1078; *Patterson*, *supra*, 223 F.3d at pp. 965–966.)

Additionally, the parties properly focused on the relevant issues during closing arguments. Specifically, the parties addressed the prosecutor's burden of proof on the issue of defendant's specific intent to commit attempted premeditated murder and addressed defendant's theory that in light of his mental disorder and intoxication, he lacked the specific intent to commit attempted premeditated murder.[5] Accordingly, we

---

[4] In his reply brief, defendant directs our attention to the Ninth Circuit's opinion in *Mills v. Swarthout* (2019) 761 Fed. Appx. 695, 697, in which the Court of Appeal affirmed the denial of Mills's habeas petition and distinguished the case, stating, "In *Stark* and *Patterson*, the instructions were to presume the defendant was 'sane' at the time of the offense, but here, the instruction was to presume Mills was '*legally* sane.'" Because the decision is unpublished, it is not precedential (Fed. Rules App. Proc. Rule 32.1; U.S. Cir. Ct. Rules (9th Cir.) rule 36-3(a)), but regardless, our analysis does not turn on the presence or absence of the word "'*legally*[.]'" (*Mills v. Swarthout*, *supra*, at p. 697.)

[5] To the extent that defendant's brief may be interpreted as contending, in part, that the prosecutor misstated the law by arguing that evidence of a mental disorder is irrelevant to the issue of intent, we do not agree with this characterization. The focus of the prosecutor's argument was that the evidence of defendant's mental health issues did not negate his intent in this case. During rebuttal argument, the prosecutor briefly referred, twice in a row, to the defense experts' testimony while attempting to argue that defendant had the specific intent to commit attempted premeditated murder. The first comment was perhaps susceptible to the interpretation that the defense experts opined on defendant's intent and the second comment expressly referred to the lack of expert testimony that defendant could not premeditate and deliberate. Defense counsel's objections were sustained and the court admonished the jury, "Ladies and gentlemen, there are certain things that doctors are allowed to testify to and that they're not allowed to testify to. And what you heard today and yesterday was [what] the doctors were allowed to testify to. [¶] And with respect to opinions, there are certain findings that you have to make that go to the ultimate issues in this case as to whether [defendant] actually formed the specific intent." The prosecutor thereafter closed by arguing that even if the jury concluded defendant was delusional, it did not negate his intent. In view of the parties'

21.

find "no reasonable likelihood that the jury would have applied the presumption of sanity to reduce the prosecutor's burden of proof[]" (*Mills*, *supra*, 55 Cal.4th at p. 680), and we reject defendant's claim to the contrary.

### 3. Any Error Under State Law Harmless

State law errors are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 837, which requires us to determine "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) Even assuming the trial court's curative instruction was erroneous under *Mills*, it was harmless. As previously discussed, the isolated instruction was given during opening statements, was intended to cure defense counsel's error and was not repeated during the court's final instructions. The parties' arguments also focused appropriately on defendant's specific intent to kill and to premeditate, the prosecutor's burden of proof, and whether or not he had the specific intent to commit attempted premeditated murder given the evidence of his mental disorder and voluntary intoxication.

In addition, the evidence that defendant formed the specific intent to kill A.R. and that he did so willfully, deliberately, and with premeditation was strong, mental illness notwithstanding. The jury had for consideration defendant's text messages from the day of the crime threatening to kill A.R. and taunting F.N. about it, a recorded phone call from the day of the crime demanding to know where F.N. was and if she was with another man, and defendant's recorded interrogation. Indeed, the jury requested to hear the recorded phone call and defendant's recorded interrogation, and view the Spanish to English translation, again during deliberation. Both pieces of evidence factored centrally in the parties' competing arguments regarding intent, and the jury's review of that

closing arguments in their entirety, we are not persuaded that the prosecutor's brief statements risked confusing or misleading the jury with respect to the evidence or the prosecutor's burden of proof.

22.

evidence suggests it took care in determining whether the evidence indicated defendant had the specific intent to commit attempted premeditated murder or instead whether, as Dr. Terrell and Dr. Blak opined, the evidence showed that defendant was in a manic or dissociative state on the day of the crime, from which the jury could have inferred that defendant did not form the specific intent to commit the crime.

Besides the recordings, the crime scene evidence depicted a calculated, methodical crime. Inside the enclosed space of a closet, defendant placed pillows, blankets, candy and A.R.'s tablet. He then closed himself and A.R. inside the closet with two propane tanks that he turned on. The hoses of both tanks were cut to allow gas to leak out inside the closet and a knife was found in the master bathroom next to another propane tank adaptor. Given the facts of the case, the instructions as a whole, and the parties' arguments, we conclude that "a result more favorable to the defense was not reasonably probable absent the instruction on the presumption of sanity." (*Mills*, *supra*, 55 Cal.4th at p. 681; accord, *People v. Aranda*, *supra*, 55 Cal.4th at p. 354.)

## III. Limitation on Scope of Experts' Testimony

### A. Background

Relevant to defendant's challenge regarding the scope of Dr. Terrell's and Dr. Blak's testimony during the guilt phase, section 28, subdivision (a) provides, "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Section 29 provides, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to

23.

whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Thus, "[e]xpert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*Coddington*, *supra*, 23 Cal.4th at pp. 582–583.)

### B.  Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.) "'[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we

affirm.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11; accord, *People v. Brooks*, *supra*, 3 Cal.5th at p. 39.)

## C. Claim of Error

Defendant claims that the trial court improperly precluded Dr. Terrell and Dr. Blak from opining that mental illness can affect or obviate intent and "can lead to overwhelming compulsion and unintentional activity." Defendant also suggests that the court precluded Dr. Blak from answering a hypothetical question. We disagree.

### 1. Reliance on *Cortes* and *Herrera*

Defendant cites *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*) and *People v. Herrera* (2016) 247 Cal.App.4th 467 (*Herrera*) for the proposition that the trial court improperly limited his expert witnesses' testimony. We agree with the People that *Cortes* and *Herrera* are inapt.

The defendant in *Cortes* stabbed another man to death during an altercation at a party and was subsequently convicted of first degree murder. (*Cortes*, *supra*, 192 Cal.App.4th at pp. 876–877.) He was evaluated by Dr. Dondershine, a psychiatrist who also testified at trial. (*Id.* at p. 891.) However, the court precluded "Dr. Dondershine from testifying about [the] defendant's upbringing, traumatic events in his life or their effect on his mental condition at the time of the crime, *at all*." (*Id.* at p. 899.) With respect to dissociation and posttraumatic stress disorder (PTSD), the trial court prohibited Dondershine from testifying "that (1) [the] defendant was in a dissociative state; or (2) exhibited any kind of behavior that established a foundation for a finding that he was in a dissociative state; or (3) to any hypotheticals, '[be]cause that's just leading to linking up an opinion'; or (4) it is psychiatrically likely [the] defendant's mental functioning was overwhelmed and impaired, because it goes to his state of mind before the crime; (5) [the] defendant has a history of extreme emotional distress, bad upbringing and mothering, because the court doubted that Dr. Dondershine spent enough time with [the] defendant to have an adequate foundation to testify about 'any of that'; or (6) [the]

25.

defendant has a history of emotional distress, including PTSD; or (7) [the] defendant had PTSD at the time of the act or that in his past there were any particular features that met those criteria, except to the extent that the jury was going to hear about his prior bad acts; or (8) Dr. Dondershine diagnosed [the] defendant with an adjustment disorder involving conduct and emotional control issues, because 'that's essentially the same as his testimony about a dissociative state'; or (9) [the] defendant experienced an emotional trauma leading to a somatic sensory recall of some incident, because Dr. Dondershine was not going to be allowed to render any opinion about [the] defendant and his behavior; or (10) why [the] defendant stabbed the victim 13 times." (*Id.* at pp. 899–900.)

In terms of what testimony should have been admitted, the Court of Appeal recognized that "the devil is in the details" (*Cortes*, *supra*, 192 Cal.App.4th at p. 909), but concluded that "at a minimum, Dr. Dondershine should have been permitted to testify to [the] defendant's diagnoses of adjustment disorder with emotional and conduct problems, attachment problems related to personality development, and psychiatric problems that could be characterized variously as PTSD, anxiety disorder or psychophysiological instability. He should have been permitted to testify about [the] defendant's upbringing and traumatic experiences as a child and/or adolescent, inasmuch as [the] defendant's prior traumatic experiences informed Dr. Dondershine's opinion, and explained the connection between [the] defendant's diagnoses, his mental state and his behavior. He should have been permitted to explain both the psychological condition and the phenomenon of dissociation, and dissociation's relationship to PTSD and [the] defendant's upbringing and traumatic experiences. He should have been permitted to explain the bases for his opinions, including [the] defendant's statements describing his perception of the stabbing[]" (*id.* at p. 910). As well, he "should have been permitted to testify that in [his] opinion, [the] defendant entered a dissociated state. He should also have been able to testify, as he did, about dissociation: its physiological basis, its psychosocial basis, and its behavioral manifestations even if, as Dr. Dondershine

testified, 'a lot of people' who have reported experiencing dissociation have described it as 'I went on automatic.' And, '[*i*]*f* de-linking or dissociation happens,' a person's memory *can* be impaired, and *can* cause the person to act without conscious volition." (*Id.* at p. 911.)

The court concluded that the error was prejudicial under *Watson* because it "effectively eviscerated any defense [the] defendant had to premediated and deliberated murder" and "prevented the jury from properly evaluating evidence that would have been relevant to its considerations of the self-defense, imperfect self-defense and heat of passion instructions given .…" (*Cortes*, *supra*, 192 Cal.App.4th at p. 912.) Furthermore, "[t]he prosecutor took full advantage of the court's ruling in closing argument[,]" arguing "that there was no alternative explanation for [the] defendant's infliction of 13 stab wounds, *except* premeditation and deliberation[; dismissing] Dr. Dondershine's testimony as 'a lot of general information'[;] [and arguing] that PTSD was about warfare, not [the] defendant, and repeatedly denigrat[ing] the evidence about [the] defendant's upbringing as so much whining .…" (*Ibid.*)

In *Herrera*, the defendant presented evidence that he was repeatedly sexually molested between the ages of 8 and 11, he was raped when he was 15 years old, he was subsequently raped again by the same man four years later, and he was repeatedly punched in the face by his then-best friend after rebuffing that friend's sexual advances. (*Herrera*, *supra*, 247 Cal.App.4th at pp. 471–472.) Thereafter, in the two-year window preceding the charge that he murdered a different friend, the defendant was diagnosed by a psychiatrist with PTSD. (*Id.* at p. 474.) Prior to trial, a psychologist also evaluated the defendant and concluded that he was suffering from PTSD and major depressive disorder. (*Ibid.*) Neither the psychiatrist nor the psychologist thought the defendant was malingering. (*Ibid.*)

At trial, the defense presented evidence that the defendant stabbed his friend after the victim put his hand down the defendant's pants, touched the defendant's penis and

27.

then came at the defendant with a knife when rebuffed, triggering a flashback during which the victim "'became'" the men who abused the defendant as a child. (*Herrera*, *supra*, 247 Cal.App.4th at p. 473.) During trial, the psychologist testified regarding PTSD and peritraumatic dissociative state, which "'occurs in response to something extremely threatening that signals danger and possible harm.' Someone experiencing this state might feel 'emotionally distant, which is called detachment,' or feel 'like it [is] happening to someone else …, which is called derealization.'" (*Id.* at p. 475.) However, the psychologist was precluded from giving her opinion that on the date of the murder, the defendant was psychiatrically impaired or suffering from PTSD or peritraumatic dissociative state. (*Ibid.*) The Court of Appeal concluded that the trial court prevented the defendant from "present[ing] the critical evidence in support of his only defense: expert testimony explaining how his past history of trauma was likely to affect his mental state at the time of the offense." (*Id.* at p. 480.) As such, the court found the error was prejudicial. (*Id.* at pp. 478, 480.)

Here, Dr. Terrell and Dr. Blak were permitted to testify regarding the mental disorders they believed defendant had, explain the bases for their diagnoses, and describe the characteristics of those mental disorders. They were also permitted to give their opinions that on the day of the crime, defendant was likely in the manic phase of bipolar disorder. In addition, Dr. Terrell opined that defendant "very likely [had] some depressive symptoms," leading him to be suicidal and homicidal, and that he was likely intoxicated that day given his claim during interrogation that he drank 12 beers and his history of heavy, daily drinking. As well, Dr. Blak opined that defendant's inability to recall what happened that day was attributable to a fugue or dissociative state, which led him to block out the crime. Under these circumstances, neither *Cortes* nor *Herrera* supports defendant's claim of error.

28.

### 2. Hypothetical Questions

Nor was defendant precluded from relying on hypothetical questions. "'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.]'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) However, "'a hypothetical question must be rooted in facts shown by the evidence[]'" (*ibid.*), and it may not be used to elicit indirectly an opinion regarding specific intent in contravention of section 29 (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327).

In this case, the prosecutor objected to the following question to Dr. Blak on the basis that it misstated the evidence: "So when you have thought disorder, when you have delusion, and when you have manic phase, you say that you end up doing something that you don't want to do, correct?" After the trial court sustained the objection, defense counsel asserted he was asking a hypothetical question and the court responded that hypothetical questions need to be based on the evidence, correctly observing that defense counsel did not ask a question rooted in the facts of the case. Thus, the ruling did not purport to bar counsel from asking a proper hypothetical question. Defense counsel subsequently succeeded in obtaining an answer to the line of questioning he was pursuing when he asked Dr. Blak if people with mental disorders "do things that they want to do?"

### 3. Limitation During Redirect Examination

Finally, what remains of defendant's argument fails to demonstrate that the trial court abused its discretion in sustaining the prosecutor's objections during redirect examination of Dr. Terrell and Dr. Blak. Defendant's claim that his experts' redirect testimony was unduly restricted by the court, thereby undermining his defense, must be viewed in the context of their earlier testimony, in which they were permitted to explain their diagnoses of defendant, describe the characteristics of those disorders or conditions, and opine on his likely mental state on the day of the crime. (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1365; *People v. Young* (1987) 189 Cal.App.3d 891, 906–907; cf.

*Coddington*, *supra*, 23 Cal.4th at pp. 581–582; *Herrera*, *supra*, 247 Cal.App.4th at pp. 474–478; *Cortes*, *supra*, 192 Cal.App.4th at pp. 910–912.)

The record expressly reflects the trial court's awareness of and sensitivity to the contours of permissible expert testimony. During Dr. Terrell's direct testimony, the parties discussed *Coddington* and *Herrera* outside the presence of the jury and the court agreed with defense counsel that it was permissible to elicit testimony regarding whether defendant's behavior on the day of the crime was consistent with his diagnosed mental disorder and how the mental disorder might affect him, as long as counsel did not veer into areas such as how the disorder affected his intent or whether it prevented him from forming intent. During Dr. Blak's redirect testimony, the court again conferred with the parties outside the presence of the jury after the prosecutor objected to defense counsel's question, which was framed to elicit the opinion that A.R. was *not* the target of defendant's destructive plan that day. The court stated it had reviewed *Herrera* again and was giving defense counsel a lot of leeway but would not allow him to "back door in" expert opinion evidence on defendant's intent that day.

### a. Dr. Terrell

Turning to the challenged rulings concerning Dr. Terrell's testimony, the trial court sustained the prosecutor's objections to questions whether a person in a manic phase "would end up making decision[s] to do something that they would not normally do but for the mental illness," whether the intent of someone with mental illness is "affected by the mental illness[,]" and whether someone who is mentally ill or in a manic phase has "the same intent to do things" as a person who is not mentally ill. The court excluded this evidence on the basis that the questions went to the ultimate issue whether defendant was able to form intent or whether he did form intent. (*Coddington*, *supra*, 23 Cal.4th at p. 582.)

Dr. Terrell and Dr. Blak testified regarding the impaired judgment, insight and decision-making that accompany mental illness such as mania and schizophrenia. Within

the context of redirect examination, which is where defendant's challenge lies, Dr. Terrell testified that people with mental illness do not make the typical mistakes that people without mental illness make, mentally ill people have an impaired reality, and that impaired reality leads them to make bad decisions. He also testified that depending on the nature and severity of the mental illness, the person's level of impairment can range from mild to moderate to severe and the person may do things he or she would not do if in a rational state of mind. Finally, responsive to his earlier testimony during cross-examination that if someone manic makes the poor decision to punch someone else, it is his or her decision to make a fist and punch, Dr. Terrell explained that a mentally ill person "can form that intent to punch the other person in the nose, but that intent is based upon faulty judgment or faulty insight, faulty reasoning due to that mental illness. Or, someone who is manic can go into states of incredible rage and anger and do horrible things and say horrible things they would not normally say or do if they were not in a[n] irrational frame of mind."

This record belies defendant's claim that he was precluded from eliciting evidence that mental illness can affect actions or intent. Defendant had the opportunity to present relevant evidence regarding his mental disorder and his mental condition on the date of the crime, and the court permitted inquiry into areas of impairment and impulsivity during redirect examination. (*People v. Young*, *supra*, 189 Cal.App.3d at p. 907.) We find no error.

### b.    Dr. Blak

During redirect examination of Dr. Blak, the trial court sustained the prosecutor's objections to the following conclusion: "A schizophrenic does not have an ability to put the brakes on." The court also sustained the prosecutor's objection to the question, which was prefaced by confirmation that defendant was suffering from schizophrenic thought disorder on the day of the crime, whether someone suffering from the disorder "do[es] things that they don't want to do?"

However, the court permitted defense counsel to ask whether people with mental disorders do things that they want to do, and Dr. Blak responded that "it's a matter of degree because there's certain disorders that involve compulsion, which is engaging in an act." Although the court sustained the prosecutor's objection and struck the last portion of Dr. Blak's answer that "[o]ne could argue if freewill would determine that they could stop doing it[,]" Dr. Blak subsequently testified that matter of degree meant severity of the mental illness and the court expressly permitted defense counsel to question Dr. Blak regarding impulsivity. To that end, Dr. Blak responded affirmatively that in a rage, some people cannot stop what they plan to do, they feel they have no control and they feel compelled to act.

As with Dr. Terrell's testimony and in the context of Dr. Blak's testimony in its entirety, we reject defendant's claim that the trial court abused its discretion by impermissibly limiting Dr. Blak's ability to offer an opinion on mental illness and its impact on intent. The record reflects otherwise.

## IV.  Cumulative Error

Finally, defendant claims cumulative error. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Even if we assume the trial court's curative instruction was erroneous under *Mills*, we conclude that defendant did not meet his burden of demonstrating error with respect to the court's evidentiary rulings and, therefore, defendant's claim of cumulative error necessarily fails. (*People v. Williams* (2013) 56 Cal.4th 165, 201, disapproved on another ground by *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9; *People v. Sedillo*, *supra*, at p. 1068; *People v. Leeds* (2015) 240 Cal.App.4th 822, 837.)

32.

**DISPOSITION**

The judgment is conditionally reversed and remanded for an eligibility determination under section 1001.36. In accordance with *Frahs*, *supra*, 9 Cal.5th at page 641, "'[i]f the trial court finds that [the defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [the defendant] successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [the defendant] does not meet the criteria under section 1001.36, or if [the defendant] does not successfully complete diversion, then his convictions and sentence shall be reinstated.'"

MEEHAN, J.

WE CONCUR:

LEVY, Acting P.J.

SNAUFFER, J.